**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABBVIE INC. and ABBVIE BIOTECHNOLOGY LTD., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:21-cv-2258 |
| v. | ) ) ) | Hon. Judge John Z. Lee |
| ALVOTECH HF., | ) ) | Magistrate Judge M. David Weisman |
| Defendant. | ) ) | |

## DEFENDANT ALVOTECH HF.'S ANSWER AND COUNTERCLAIMS TO PLAINTIFFS' COMPLAINT

Defendant and Counterclaim-Plaintiff, Alvotech hf., by its undersigned attorneys, hereby responds to the complaint of Plaintiffs and Counterclaim-Defendants AbbVie Inc. and AbbVie Biotechnology Ltd. as follows.

Plaintiffs' complaint defines "Alvotech" to mean Defendant Alvotech hf. and uses "AbbVie" without providing a definition. The use of these names in the complaint creates ambiguity and confusion with respect to certain of Plaintiffs' allegations. All references in Defendant's Answer, Defenses, and Counterclaims to Alvotech hf. (or "Defendant"), Alvotech USA (Defendant's subsidiary, Alvotech USA, Inc.), AbbVie Inc., and AbbVie Biotechnology Ltd. mean the individual entity.

## ANSWER AND DEFENSES

Defendant denies all allegations in the complaint, whether express or implied, that are not specifically admitted below. Any factual allegation admitted below is admitted only as to the specifically admitted facts, and not as to any purported conclusions, characterizations,

implications, or speculations that may arguably follow from the admitted facts. Many of Plaintiffs' allegations and characterizations in the complaint are vague and/or ambiguous, including, as an example, Plaintiffs' use of the terms "Alvotech" and "AbbVie." To the extent any allegation in Plaintiffs' complaint is vague and/or ambiguous, Defendant denies the allegation in question. Moreover, much of AbbVie's complaint does not comply with the Rule 8 requirement for a short and plain statement of the claim, with limited facts inextricably intertwined with AbbVie argument.

## INTRODUCTION

1. AbbVie's scientists and clinicians invested decades developing the groundbreaking drug HUMIRA®—the first fully human antibody ever approved by the U.S. Food and Drug Administration ("FDA")—and expanding its use into a variety of diseases and patient populations, as well as launching a new formulation that lessens pain upon injection. Over one million patients have benefited from AbbVie's pioneering work, which also has produced a robust portfolio of patents and trade secret manufacturing processes.

**ANSWER**:

On information and belief, Defendant admits that Humira® was the first fully human antibody ever approved by the FDA. Defendant also admits that AbbVie's advertising materials tout that the 100 mg/ml "citrate-free" formulation causes less pain than the 50 mg/ml formulation. Defendant does not have knowledge or information sufficient to respond to the other characterizations and allegations in paragraph 1 and therefore denies them.

2. Numerous biosimilar companies—now including Defendant Alvotech hf. ("Alvotech" or "Defendant")—have taken note of AbbVie's success as well, attempting to make copycat versions of HUMIRA®.

**ANSWER**:

Denied.

3. The Biosimilar Price Competition and Innovation Act of 2009 ("BPCIA") established an abbreviated process by which such biosimilar applicants could seek FDA approval. But while the BPCIA gives would-be biosimilar makers like Alvotech a regulatory pathway for their biosimilar versions of HUMIRA®, it does *not* give Alvotech license to infringe AbbVie's

2

patents. And it certainly did not permit Alvotech to steal AbbVie's trade secret manufacturing processes, which is the subject of related case *AbbVie Inc. v. Alvotech hf.*, Civ. No. 1:21-cv-01530 (N.D. Ill. Mar. 19, 2021) (Leinenweber, J.).

**ANSWER**:

To the extent paragraph 3 implicates legal conclusions, no response is required. Defendant

denies that Plaintiffs are entitled to any relief pursuant to their claims. Defendant denies any

remaining characterizations and allegations in paragraph 3.

4.     AbbVie's HUMIRA® patent portfolio is notable for its proven quality. Numerous biosimilar makers have previously filed a total of 20 *inter partes* review ("IPR") petitions challenging 14 of AbbVie's patents at the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office ("USPTO"). Despite the lower burden of proof compared to district court proceedings (a preponderance of the evidence rather than clear and convincing evidence, and at the time a broad claim construction standard) and the high invalidation rate in IPRs, AbbVie prevailed on nine of its patents in 13 IPRs, with challenges to two more patents withdrawn. Ultimately, each of the prior biosimilar applicants recognized the strength of the portfolio and sought licenses with AbbVie. Biosimilars to HUMIRA® will enter the U.S. market in 2023.

**ANSWER**:

To the extent paragraph 4 implicates legal conclusions, no response is required. Defendant

admits that third parties have filed IPR petitions requesting review of patents relating to

adalimumab. On information and belief, Defendant admits that public information indicates that

AbbVie has settled with a number of biosimilar applicants of the 50 mg/ml formulation of Humira®

for U.S. entry dates in 2023. Defendant denies any remaining characterizations and allegations in

paragraph 4.

5.     Of particular relevance, the PTAB has already rejected four petitions challenging the validity of one of the AbbVie patents at issue in this proceeding (namely U.S. Patent No. 9,085,619, directed to buffer-free formulations of adalimumab: the active ingredient of HUMIRA®). The PTAB similarly rejected a petition challenging the validity of a related family member of another AbbVie patent at issue, U.S. Patent No. 8,961,973, directed to induction dosing to treat Crohn's disease.

**ANSWER**:

To the extent paragraph 5 implicates legal conclusions, no response is required. Defendant admits that third parties have filed IPR petitions requesting review of patents relating to adalimumab. Otherwise denied.

6.    In late 2020, Alvotech sought FDA approval to launch its own biosimilar of HUMIRA®, and it contends that AbbVie's patents are invalid, not infringed, and unenforceable.

**ANSWER**:

Defendant admits that its subsidiary, Alvotech USA applied to the FDA for licensure of AVT02. Defendant further admits that on November 3, 2020, the FDA notified Alvotech USA that Alvotech USA's application was sufficiently complete to permit substantive review by the FDA. Defendant admits that it contends that AbbVie's patents are invalid, not infringed, and unenforceable.

7.    HUMIRA® belongs to a category of drugs known as biologics. Biologics are complex proteins manufactured in living cells rather than by chemical synthesis. These are critically important drugs that are difficult to develop, manufacture, formulate, and administer. In bringing HUMIRA® from the laboratory to patients, AbbVie operated in uncharted territory. In 1996, AbbVie invented the antibody in HUMIRA®. But that was only the first step. Since then, over more than two decades, AbbVie has invested hundreds of millions of dollars in continuing research and innovation.

**ANSWER**:

Defendant admits that Humira® belongs to a category of drugs known as biologics, which are proteins manufactured in living cells rather than by chemical synthesis. On information and belief, Defendant denies that AbbVie invented the antibody in Humira®, adalimumab. Defendant does not have information sufficient to respond to the other allegations in paragraph 7 and therefore denies them.

8.    AbbVie's investment in HUMIRA® development includes over 100 clinical trials and has resulted in FDA approval for the treatment of thirteen different disease conditions, including rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, psoriasis, Crohn's disease (adult and pediatric), ulcerative colitis (adult and pediatric), hidradenitis suppurativa (adult

4

and pediatric), uveitis (adult and pediatric), and juvenile idiopathic arthritis. AbbVie has continued to dedicate substantial resources to an extensive clinical trial program, including research specifically to benefit children. For example, in February of this year, AbbVie received FDA approval to treat pediatric patients living with moderately to severely active ulcerative colitis, making HUMIRA® the first and only subcutaneous biologic treatment option for pediatric patients five years and older with this condition. Alvotech seeks to copy, and profit from, the results of AbbVie's clinical development.

**ANSWER**:

Defendant admits that the FDA has approved Humira® for the treatment of different disease conditions set forth on the Humira® label. Defendant also admits that its subsidiary, Alvotech USA, applied to the FDA for licensure of AVT02, a biosimilar to Humira®. For the remaining allegations and characterizations, Defendant does not have information sufficient to respond and therefore denies them. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims. Defendant denies the remaining allegations of paragraph 8.

9. AbbVie also has continued to improve and develop the HUMIRA® product itself. First, AbbVie invested in and created a subcutaneous, high concentration, liquid formulation of the HUMIRA® antibody. Before AbbVie's launch of HUMIRA®, patients had to go to the hospital to receive their medicine intravenously, or mix batches of their medicine at home (difficult for patients with inflamed joints) and inject themselves twice a week. As a result of AbbVie's dedication, innovation, and investment, patients were able to inject the medicine at home using pre-filled syringes or automatic injection devices, and take fewer injections. The added convenience and precision improved patients' lives and increased compliance, all without sacrificing HUMIRA®'s outstanding efficacy.

**ANSWER**:

Defendant admits that Humira® was first approved for use supplied in a single-use, 1 mL pre-filled glass syringe and also 2 mL glass vials as a sterile, preservative-free solution for subcutaneous administration. For the remaining allegations and characterizations, Defendant does not have information sufficient to respond and therefore denies them. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims. Defendant denies the remaining allegations of paragraph 9.

10.     But AbbVie did not stop there. Through continuing investment into formulation research, AbbVie developed a new, higher-concentration (100 mg/mL), citrate-free formulation with reduced pain upon injection. AbbVie's inventive new formulation leverages the surprising inventions patented by AbbVie researchers, namely that the active ingredient, adalimumab, can be formulated at high concentrations *without a buffer*, while maintaining solubility and stability— including during long-term storage or other processing steps. It is this latest innovative formulation that Alvotech seeks to copy. Alvotech's founder and Chairman—Robert Wessman—explained earlier this year how Alvotech monitored and sought to replicate AbbVie's advances, switching gears from a 50 mg/mL concentration copy of adalimumab to a 100 mg/mL high- concentration version as soon as Alvotech "heard that AbbVie was getting ready to launch 100mg." Wallace, David, "Celltrion Wins Global First Approval For High-Concentration Humira Biosimilar," Generics Bulletin (Feb. 15, 2021), attached as Exhibit 1 ("We were actually active in developing 50mg three or four years back," Wessman noted, but "when we heard that AbbVie was getting ready to launch 100mg we stopped that and started to focus only on 100mg. We did not even consider 50mg any more.").

**ANSWER**:

Defendant admits FDA approved a 100 mg/ml formulation of Humira® in 2015.  Defendant admits that it independently developed a biosimilar of the 100 mg/ml version of Humira®, known as AVT02.  Defendant admits that David Wallace attributed quotes to Robert Wessman in an article titled "Celltrion Wins Global First Approval For High-Concentration Humira Biosimilar," published in Generics Bulletin on February 15, 2021.  For the remaining allegations and characterizations regarding AbbVie, Defendant does not have information sufficient to respond and therefore denies them.  Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.  Defendant denies the remaining allegations of paragraph 10.

11.     AbbVie has also spent many years developing and improving the complex manufacturing processes for HUMIRA® and its active ingredient, adalimumab. Again, unlike traditional drugs, HUMIRA® is a complex biologic created in living organisms. So even minor changes to the manufacturing process can impact the drug's stability, purity, and efficacy. AbbVie obtained patents, as well as trade secrets, covering innovations in manufacturing.

**ANSWER**:

Defendant admits that Humira® is a biologic drug, and its active ingredient, adalimumab, is created in living cells.  For the remaining allegations, Defendant does not have information

sufficient to respond and therefore denies them. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

12. Alvotech seeks not only to copy and to profit from the results of AbbVie's innovative manufacturing work, but also has shown a willingness to take improper shortcuts in doing so. On March 19, 2021, AbbVie filed suit against Alvotech for theft of trade secrets related to the commercial manufacturing process for HUMIRA®, crucial to launching a new manufacturing facility. *AbbVie Inc. v. Alvotech hf.*, Civ. No. 1:21-cv-01530, Dkt. 1 at ¶¶ 3, 5, 28, 30 (N.D. Ill. Mar. 19, 2021). Manufacturing a biologic drug—particularly on a commercial scale— requires complex and finely tuned manufacturing techniques that are distinct from the manufacturing, formulation, and indication inventions in AbbVie's patent portfolio. AbbVie invested substantial time and expertise to develop, scale, and fine-tune its proprietary high-volume manufacturing processes, and carefully guards this trade secret information—including sharing it with its employees only on a need-to-know basis.

**ANSWER**:

Denied.

13. Instead of investing the necessary time and resources to develop its own manufacturing process for its copycat version of HUMIRA®, Alvotech surreptitiously acquired AbbVie's confidential and proprietary trade secrets, including by hiring at least one such employee: Rongzan Ho, a Team Leader for upstream manufacturing at AbbVie, who circumvented AbbVie's security protocols to email himself AbbVie manufacturing trade secrets before leaving to join Alvotech in the very same role. *Id.* at ¶¶ 3, 40, 58, 63. Just before leaving AbbVie, for Alvotech's benefit and at its direction, Mr. Ho transmitted AbbVie's confidential and proprietary trade secret information—including voluminous Excel spreadsheets full of sensitive manufacturing data—to his personal email account. *Id.* at ¶¶ 54-64. These confidential materials contained detailed and closely guarded information concerning AbbVie's upstream manufacturing process for HUMIRA® which AbbVie had developed over decades of research. *Id.* Alvotech then installed Mr. Ho in the very same role, supervising upstream manufacturing of the exact same product: AVT02, Alvotech's copy of HUMIRA®, for the purpose of using and benefitting from Mr. Ho's intimate knowledge of AbbVie's trade secrets. *Id.* at ¶¶ 54-64, 89.

**ANSWER**:

Denied.

14. Alvotech has also shown it is unwilling to follow the law in connection with this case. Under the BPCIA, 42 U.S.C. § 262(*l*) outlines a framework for the would-be biosimilar maker (here, Alvotech) and reference product sponsor (here, AbbVie) to resolve patent disputes. Specifically, the BPCIA sets forth requirements for exchange of information between the parties: under the statute, Alvotech must provide not only its abbreviated Biologics License Application (aBLA), but also its manufacturing information to AbbVie. *See* 42 U.S.C. § 262(*l*)(2)(A) (applicant shall provide "such other information that describes the process or processes used to manufacture the biological product that is the subject of such application"). Despite multiple requests, Alvotech

has failed to fulfill its obligations and disclose necessary manufacturing information for its biosimilar product. Instead of properly investigating its own records, Alvotech in many instances provided incomplete information, hedging its disclosures about *its own product and processes* with statements like "upon information and belief" and "as will be confirmed through further discovery."

**ANSWER**:

To the extent paragraph 14 implicates legal conclusions, no response is required. To the extent a response is required, denied.

15.     The BPCIA provides a mechanism for AbbVie to litigate its patents before Alvotech actually launches its biosimilar product. Through this process, AbbVie identified 62 patents that would be infringed by Alvotech's biosimilar product. Yet this lawsuit involves only four of those 62 patents. This is because Alvotech selected just those four patents for this first phase of litigation, despite the fact that BPCIA specifically allows the biosimilar company to select all patents identified by the innovator, or as many as it would like to litigate. AbbVie expressly and clearly explained that litigating just those four patents would not resolve Alvotech's patent issues—but Alvotech did not change course, nor did it propose including additional patents in this litigation. As AbbVie explained, if and when Alvotech provides its 180-day Notice of Commercial Marketing, and as circumstances otherwise warrant, AbbVie will have the opportunity to assert the remaining patents. Therefore, this is merely the first round of litigation between the parties, and (by Alvotech's choice) there will necessarily be a second phase of litigation to adjudicate the rest of AbbVie's substantial patent rights relating to HUMIRA®.

**ANSWER**:

To the extent paragraph 15 implicates legal conclusions, no response is required. Defendant admits that its subsidiary Alvotech USA engaged in the disclosure process outlined by the BPCIA. Defendant responds that those disclosures speak for themselves. Defendant admits that Plaintiffs filed an action against Defendant in this District for infringement of four patents. For the remaining allegations and characterizations, Defendant does not have information sufficient to respond and therefore denies them. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

16.     AbbVie brings this suit to prevent Alvotech from infringing the four patents identified in this Complaint. AbbVie also reserves its rights to seek preliminary injunctive relief in this action and to assert the remaining patents in a second phase, if and when Alvotech provides a Notice of Commercial Marketing, or as circumstances otherwise warrant.

**ANSWER**:

Defendant lacks knowledge or information sufficient to form a belief about the allegations in paragraph 16 and therefore denies them. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

### NATURE OF THE ACTION

17. AbbVie Inc. and AbbVie Biotechnology Ltd ("ABL," collectively referred to as "AbbVie" or "Plaintiffs") for their Complaint against Alvotech further allege as follows:

**ANSWER**:

No response is required to the preamble of this section of the Complaint. To the extent a response is required, denied.

18. This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, including 35 U.S.C. § 271(e)(2)(C).

**ANSWER**:

Defendant admits that Plaintiffs purport to assert claims under 35 U.S.C. § 271(e)(2)(C). Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

19. This lawsuit results from Alvotech's infringement of AbbVie patents that concern AbbVie's groundbreaking drug, HUMIRA®.

**ANSWER**:

On information and belief, Defendant admits that Plaintiffs purport to assert patent infringement claims against Defendant relating to Humira®. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

20. AbbVie Inc. is the holder of Biologic License Application ("BLA") No. 125057 for HUMIRA®, whose active pharmaceutical ingredient is the antibody, adalimumab.

**ANSWER**:

On information and belief, Defendant admits the allegations in paragraph 20.

21.    In 1996, after many years of intense research, AbbVie's predecessor first created adalimumab. Adalimumab, a biologic, is a fully human, high-affinity, and neutralizing therapeutic antibody against human TNF-α, a protein made by the human body as part of the body's immune response. The mechanisms by which TNF-α affects the body are complex and not completely understood (even today). Inventing the adalimumab antibody itself, however, was only the first step in a long process. Following the isolation and characterization of adalimumab, AbbVie and its predecessor Abbott Laboratories spent more than two decades and hundreds of millions of dollars on scientific studies and clinical trials to determine how to use HUMIRA® to treat patients for different diseases, how to formulate HUMIRA® for easier administration, how to improve and further develop the formulation, and how to manufacture HUMIRA®. AbbVie's scientific and clinical investments in HUMIRA® continue to this day—leading, for example, to the February 2021 approval of HUMIRA® to treat pediatric patients living with moderately to severely active ulcerative colitis.

**ANSWER**:

On information and belief, Defendant admits that in around 1995, a German company, BASF AG, filed a patent application disclosing adalimumab and methods of using it to treat TNFα-related autoimmune diseases, and AbbVie's predecessor, Abbott Laboratories, later purchased the rights held by BASF. Defendant admits that adalimumab is a tumor necrosis factor blocker and a recombinant human IgG1 monoclonal antibody with human derived heavy and light chain variable regions and human IfF1:k constant regions. Defendant also admits that Humira® is approved by FDA for the indications described in the Humira® label. Otherwise, denied.

22.    AbbVie's innovative work has been recognized by the medical and scientific community. For example, in 2007, HUMIRA® was awarded the Galien Prize, perhaps the most prestigious honor in the pharmaceutical and biotechnology world.

**ANSWER**:

On information and belief, Abbott Laboratories received the 2007 Galien Prize for the 50 mg/ml version of Humira®. Defendant lacks knowledge or information sufficient to form a belief about the remaining allegations in paragraph 22 and therefore denies them.

23.    More importantly, AbbVie's work has benefited patients immensely. Children have gone from wheelchairs to playgrounds, and adults have gone from bed to work. AbbVie is very proud of the fact that HUMIRA® has improved the lives of more than one million patients to date.

**ANSWER**:

Defendant admits that Humira® is FDA approved as indicated on the label to treat certain autoimmune diseases in both adults and children. Defendant lacks knowledge or information sufficient to form a belief about the remaining allegations in paragraph 23 and therefore denies them.

24. Although Alvotech had the option of litigating all (or any subset) of the patents identified by AbbVie during the exchanges required under the BPCIA, Alvotech chose instead to limit this lawsuit to only four of AbbVie's 62 identified patents. But while Alvotech can delay justice, it cannot prevent it: pursuant to the BPCIA, AbbVie can seek additional relief, including an injunction, on the remaining patents when Alvotech files a Notice of Commercial Marketing, which it must do at least 180 days prior to launching its biosimilar product.

**ANSWER**:

To the extent paragraph 24 implicates legal conclusions, no response is required. Defendant admits that its subsidiary Alvotech USA engaged in the disclosure process outlined by the BPCIA. Defendant responds that those disclosures speak for themselves. Defendant admits that Plaintiffs filed an action against Defendant in this District for infringement of four patents. Defendant lacks knowledge or information sufficient to form a belief about the remaining allegations of paragraph 24 and they are denied. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

## PARTIES

25. Plaintiff AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie Inc. employs thousands of people in Illinois—including named inventors of the four patents in suit—and is engaged in the development, sale, and distribution of a broad range of pharmaceutical and biologic drugs, including HUMIRA®. HUMIRA® was developed under the leadership of AbbVie's management in Illinois.

**ANSWER**:

On information and belief, AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064. Defendant does not have information sufficient to respond to the other allegations in paragraph 25 and therefore denies them.

26.     Plaintiff ABL is a corporation organized and existing under the laws of Bermuda, with a place of business at Clarendon House, 2 Church Street, Hamilton HM1l, Bermuda. Through intermediate organizations, Plaintiff AbbVie Inc. owns Plaintiff ABL.

**ANSWER**:

On information and belief, Defendant admits the allegations in paragraph 26.

27.     On information and belief, Defendant Alvotech is a company organized and existing under the laws of Iceland, with its principal place of business at Sæmundargata 15-19, 101 Reykjavík, Iceland.

**ANSWER**:

Admitted.

28.     Alvotech is in the business of developing, manufacturing, marketing, and selling biologic drugs, including the proposed biosimilar version of AbbVie's HUMIRA® (adalimumab) product, AVT02. Alvotech has taken steps to enable these drugs to be distributed and sold in the State of Illinois, including in this District, and throughout the United States.

**ANSWER**:

Defendant admits it is in the business of developing and manufacturing biologic drugs, including the proposed biosimilar version of Humira® (adalimumab) product, AVT02. Defendant admits that its subsidiary, Alvotech USA, applied to the FDA for licensure of AVT02. Defendant denies the remaining allegations in paragraph 28.

## JURISDICTION AND VENUE

29.     This is an action for patent infringement under the Patent Laws of the United States, Title 35, United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER**:

Paragraph 29 states a legal conclusion for which no response is required. To the extent a response is required, Defendant admits, on information and belief, that Plaintiffs purport to assert claims under the Patent Laws of the United States, Title 35, United States Code. Defendant denies that this Court has subject matter jurisdiction pursuant for the purposes of this action, as explained in its motion to dismiss and accompanying briefing. Defendant denies that Plaintiffs are entitled to any relief pursuant to their claims.

30. This Court has personal jurisdiction over Alvotech for at least the reasons set forth below.

**ANSWER**:

Paragraph 30 states a legal conclusion for which no response is required. To the extent a response is required, Defendant denies that this Court has personal jurisdiction over it as explained in Defendant's motion to dismiss and accompanying briefing.

31. Alvotech has purposefully directed activities at residents of Illinois and this District, and this action arises out of and relates to those activities. For example, Alvotech has taken the costly, significant step of submitting Alvotech's abbreviated Biologics License Application ("Alvotech's aBLA") to the FDA seeking approval to engage in the commercial manufacture, use, sale, and/or distribution of the Alvotech aBLA Product in Illinois, including in this District, and Alvotech will do so upon approval of its aBLA. The submission of Alvotech's aBLA is therefore tightly tied, both in purpose and planned effect, to the deliberate making of sales of Alvotech's aBLA Product in Illinois, including in this District, and reliably indicates that Alvotech's aBLA Product will be marketed in Illinois, including in this District. Furthermore, Alvotech sent Alvotech's aBLA to AbbVie Inc. at its corporate headquarters in North Chicago, Illinois.

**ANSWER**:

Paragraph 31 states a legal conclusion for which no response is required. To the extent a response is required, Defendant admits that its subsidiary, Alvotech USA applied to the FDA for licensure of AVT02 and provided Plaintiff AbbVie Inc. with the AVT02 BLA and voluminous other information required under 42 U.S.C. § 262(*l*)(A). Defendant further admits that AVT02

13

cannot be sold within the United States, including in this District and Illinois, before FDA approval of the AVT02 BLA.  Otherwise denied.

32.     Alvotech prepared and submitted Alvotech's aBLA and intends to directly benefit from the sale of the Alvotech aBLA product. Prior to the submission of Alvotech's aBLA (and prior to the formation of its wholly-owned U.S. subsidiary, Alvotech USA, Inc. ("Alvotech USA"), Alvotech met with the FDA regarding Alvotech's AVT02. Alvotech prepared, created, approved, and/or assembled documentation in support of Alvotech's aBLA.  Alvotech then directed Alvotech USA to act as its agent between the FDA and Alvotech during the regulatory process.

**ANSWER**:

To the extent paragraph 32 implicates legal conclusions, no response is required.  To the extend a response is required, Defendant admits that its subsidiary Alvotech USA, which is responsible for the Alvotech family's legal, governmental policy, and regulatory affairs, is the applicant for AVT02 BLA No. 761205.  Defendant also admits that it is named in the AVT02 BLA as the drug substance and drug product manufacturer.  Defendant further admits that before Alvotech USA incorporated, Defendant representatives and representatives of Alvotech Swiss AG met with the FDA regarding AVT02.  Defendant further admits that distribution of AVT02 will provide benefits, including to patients.   Defendant denies the remaining allegations in paragraph 32.

33.     Alvotech USA is the "wholly-owned, regulatory affairs, governmental policy and legal subsidiary" of Alvotech. *See* Office Locations, Alvotech, "Our Locations," https://www.alvotech.com/company/office-locations (last visited April 6, 2021), attached as Exhibit 2. On information and belief, Alvotech USA is a small company that is not involved with drug development, manufacturing, or sales. On information and belief, Alvotech USA only has one office with a few thousand square feet on part of one floor of an office building, and has fewer than 15 employees—none of whom are manufacturing, sales, or marketing employees, but rather work in legal or regulatory positions.

**ANSWER**:

Defendant admits that Alvotech USA is a wholly-owned subsidiary of Alvotech hf. Defendant further admits that Alvotech USA employees are responsible for the Alvotech family's legal, governmental policy, and regulatory affairs (among other things), centered in Alexandria,

14

Virginia.  Defendant also admits that the website and document cited in paragraph 33 contains the quoted language.  Otherwise, denied.

34.     Alvotech, not Alvotech USA, created and prepared the information in the aBLA. Indeed, at least one clinical trial for AVT02 began before Alvotech USA even came into existence, and Alvotech communicated and/or met with the FDA before beginning that trial. *Compare* ClinicalTrials.gov, "Comparative Safety, Tolerability, Pharmacokinetic Study of AVT02 (100MG/ML) and Humira (100MG/ML) in Healthy Volunteers (ALVOPAD)," https://clinicaltrials.gov/ct2/show/NCT03579823?term=AVT02&draw=2&rank=1 (last visited Mar. 10, 2021), attached as Exhibit 3 (study start date - May 21, 2018) *with* Exhibit 4 (Alvotech USA incorporated on January 11, 2019). Alvotech has also stated that its aBLA "filings were based on the results of a comprehensive development program and data package comprising of a totality of evidence demonstrating a high degree of similarity of AVT02 compared to its reference product." *See* Press Release, Alvotech, "Alvotech announces that the U.S. FDA and EMA have accepted regulatory submissions for AVT02, a proposed biosimilar to Humira® (adalimumab)," Nov. 19, 2020, https://www.alvotech.com/newsroom/alvotech-announces-that-the-u.s.-fda-and-ema-have-accepted, attached hereto as Exhibit 5.

**ANSWER**:

Defendant admits that at least one clinical trial for AVT02 commenced before Alvotech USA incorporated.  Defendant further admits that before Alvotech USA incorporated, Defendant's representatives and representatives of Alvotech Swiss AG met with the FDA regarding AVT02. Defendant further admits the documents cited in paragraph 34 include the quoted language and that those cited documents speak for themselves.  Defendant denies the remaining allegations in paragraph 34.

35.     To support its aBLA, Alvotech submitted data generated by clinical trials to the FDA. *See* 42 U.S.C. § 262(k)(2)(A)(i)(I)(cc) ("An application . . . shall include information demonstrating that — the biologic product is a biosimilar to a reference product based upon data derived from . . . a clinical study or studies . . . that are sufficient demonstrate safety, purity, and potency in 1 or more appropriate conditions of use for which the reference product is licensed and intended to be used and for which licensure is sought for the biological product."); *see also* 21 C.F.R. § 601.2(a) ("To obtain a biologics license . . . the manufacturer . . . shall submit data derived from . . . clinical studies which demonstrate that the manufactured product meets prescribed requirements of safety, purity, and potency . . . ."). For example, Alvotech has and is currently sponsoring, directing, and/or authorizing at least six clinical trials of the Alvotech aBLA Product. Clinical trials for the Alvotech aBLA Product began at least as early as May 21, 2018 and Alvotech manufactured the Alvotech aBLA Product lots that were used in the clinical trials and described in the aBLA. *See* Exhibit 3.

**ANSWER**:

To the extent paragraph 35 implicates legal conclusions, no response is required. To the

extent a response is required, Defendant admits that its subsidiary Alvotech USA is the applicant

for AVT02 BLA No. 761205. Defendant admits AVT02 clinical trials continue, and that

Defendant manufactured or caused to be manufactured the AVT02 lots that were used in the

clinical trials. Defendant denies the remaining allegations in paragraph 35.

36.     Additionally, Alvotech publicized its Phase I and Phase III clinical trials comparing
the Alvotech aBLA Product to HUMIRA®. *See* Press Release, Alvotech, "Alvotech announces
positive top-line results for two comparative studies for AVT02, a proposed biosimilar to
HUMIRA® (adalimumab)," May 12, 2020, https://www.alvotech.com/newsroom/alvotech-
announces-positive-top-line-results-for-two-comparative-studies-for-avt02-a-proposed-
biosimilar-to-humira-adalimumab, attached hereto as Exhibit 6. Alvotech specifically stated that
"Alvotech is developing [the Alvotech aBLA Product] as a proposed biosimilar to HUMIRA®
(adalimumab) with high concentration (100 mg/mL) dosage forms." *Id.*

**ANSWER**:

Defendant admits that the document cited in paragraph 36 includes the quoted language

and that document speaks for itself. Defendant further admits that it is developing AVT02, a

proposed biosimilar to Humira® (adalimumab) with high concentration (100 mg/mL) dosage

forms. Defendant denies any remaining allegations in paragraph 36.

37.     On information and belief, Alvotech will financially benefit in a significant manner
from the approval of Alvotech's aBLA, since Alvotech will engage in the commercial manufacture
and supply of the Alvotech aBLA Product in Illinois, including this District. For example,
Alvotech and Teva entered into an "exclusive strategic partnership for the commercialization in
the U.S." of the Alvotech aBLA Product and Alvotech will share in profits from sales in the U.S.
Press Release, Alvotech, "Alvotech and Teva announce strategic partnership to collaborate in the
U.S. biosimilar market," Aug. 5, 2020, https://www.alvotech.com/newsroom/alvotech-and-teva-
announce-strategic-partnership-to, attached as Exhibit 7; *see also* Exhibit 5 (stating that the
Alvotech aBLA Product is one of the biosimilar product candidates part of the Alvotech-Teva
strategic partnership). Under the "partnership agreement," Alvotech "will be responsible for the
development, registration and supply of the [AVT02], while Teva will be exclusively
commercializing [AVT02] in the U.S." Exhibit 7; *see also* Exhibit 5.

**ANSWER**:

Defendant admits that it expects to financially benefit from commercialization of AVT02. Defendant further admits that AVT02 will be manufactured in Iceland and that AVT02 will be marketed in the United States. Defendant admits that the documents cited in paragraph 37 are dated August 5, 2020 and November 19, 2020, contain the quoted language, and those documents speak for themselves. Defendant denies the remaining allegations in paragraph 37, including to the extent paragraph 37 implies Defendant specifically targeted Illinois as explained in its motion to dismiss and accompanying briefing.

38. On information and belief, if Alvotech's aBLA is approved, the Alvotech aBLA Product will be administered to patients in Illinois, and within this District. These activities, as well as Alvotech's manufacturing, marketing, selling, and/or distributing of the Alvotech aBLA Product, will have a substantial effect within Illinois, and within this District, and will constitute infringement of U.S. Patent Nos. 8,420,081, 8,926,975, 8,961,973, and 9,085,619, in the event that the Alvotech aBLA Product is approved before any of these patents expire.

**ANSWER**:

Paragraph 38 states legal conclusions for which no response is required. To the extent a response is required, and for the allegations in paragraph 38 regarding administration of AVT02, Defendant does not have information sufficient to respond and therefore denies them. Defendant denies the remaining allegations in paragraph 38. Defendant denies Plaintiffs are entitled to any relief pursuant to their claims.

39. For the reasons described above, among others, the submission of Alvotech's aBLA was suit-related conduct with a substantial connection to Illinois and this District, the exercise of personal jurisdiction over Alvotech does not offend traditional notions of fair play and substantial justice, and this Court may properly exercise personal jurisdiction over Alvotech.

**ANSWER**:

Paragraph 39 states legal conclusions for which no response is required. To the extent a response is required, Defendant denies it is subject to personal jurisdiction in this District for the

reasons stated in its motion to dismiss and accompanying briefing.  Defendant denies the remaining

allegations in paragraph 39.

### D. Venue[1]

40.      Venue lies in this District pursuant to 28 U.S.C. § 1391, including because, *inter alia*, Alvotech is a foreign entity, and thus is subject to suit in any jurisdiction in the United States including the Northern District of Illinois. 28 U.S.C. § 1391(c).

**ANSWER**:

Paragraph 40 states a legal conclusion for which no response is required.  To the extent a

response is required, Defendant admits that venue is proper in this Court for purposes of

adjudicating Plaintiffs' claims against Defendant Alvotech hf. in this action only.  Defendant

denies that Plaintiffs are entitled to any relief pursuant to their claims.  Defendant denies any

remaining allegations of paragraph 40.

### THE PARTIES' EXCHANGES UNDER THE BPCIA

41.      On information and belief, in late August or early September 2020, Alvotech submitted abbreviated Biologics License Application No. 761205 to the FDA pursuant to the BPCIA, specifically 42 U.S.C. § 262(k), requesting that its biosimilar adalimumab product AVT02 be licensed for commercial sale by relying on AbbVie's demonstration that HUMIRA® is safe, pure, and potent. The BPCIA provides an abbreviated pathway for approval of a biologic product that is "biosimilar" to a "reference product." Alvotech has demonstrated its intention to utilize AbbVie's data and work discovering and developing adalimumab through the use of the abbreviated BPCIA biosimilar pathway.

**ANSWER**:

To the extent paragraph 41 implicates legal conclusions, no response is required.  To the

extent a response is required, Defendant admits that on September 4, 2020, its subsidiary Alvotech

USA applied to the FDA for licensure of AVT02, and the FDA assigned BLA No. 761205 for

---

[1] Defendant substantially mirrors the headings set forth in the Complaint in order to simplify comparison of the Complaint and this Response.  In doing so, Defendant makes no admission regarding the substance of the headings or any other allegations of the Complaint.  Unless otherwise stated, to the extent a particular heading can be construed as an allegation, Defendant specifically denies all such allegations.

Alvotech USA's AVT02 application. Defendant denies any remaining allegations of paragraph 41.

42. To facilitate the protection of biologic innovators' patent rights, Congress created an act of infringement related to the submission of an application under subsection 262(k), *see* 35 U.S.C. § 271(e)(2)(C), and enumerated a set of pre-litigation exchanges under the BPCIA that are outlined at 42 U.S.C. § 262(*l*). The subsection *(l)* procedures are intended to ensure that the maker of an innovative biologic product that is the subject of a biosimilar application will have sufficient time and opportunity to enforce its patent rights before a biosimilar product enters the market. The BPCIA also requires that a subsection (k) applicant give at least 180 days' notice before the first commercial marketing of a biosimilar licensed by the FDA. 42 U.S.C. § 262(*l*)(8)(A). The statute specifically contemplates injunctive relief, including preliminary injunctive relief, to prevent unlawful infringement.

**ANSWER**:

To the extent paragraph 42 implicates legal conclusions, no response is required. Defendant denies any remaining allegations in paragraph 42.

43. Alvotech represents that the FDA accepted Alvotech's aBLA for the Alvotech aBLA Product for review on or before November 5, 2020.

**ANSWER**:

Defendant admits that on November 3, 2020, the FDA notified Alvotech USA that Alvotech USA's application was sufficiently complete to permit substantive review by the FDA. Defendant denies the remaining allegations in paragraph 43.

44. On November 5, 2020, Alvotech contacted AbbVie and indicated that it had submitted an aBLA to the FDA and that the FDA accepted the aBLA for review. Subsequently, in a November 19, 2020 press release, Alvotech announced that the FDA had accepted the aBLA for review.

**ANSWER**:

Defendant admits that on November 5, 2020, Alvotech USA's Chief IP Counsel and Deputy General Counsel contacted AbbVie Inc. to inform it that the FDA had accepted Alvotech USA's application and assigned it BLA No. 761205. Defendant also admits that the document cited in paragraph 44 relates to the FDA's acceptance of the AVT02 BLA, the document is dated

November 19, 2020, and that document speaks for itself. Defendant denies the remaining allegations in paragraph 44.

45.     In November 2020, the parties began exchanging information in accordance with the procedures outlined in the BPCIA. On or about November 5, 2020, Alvotech provided outside counsel for AbbVie, and AbbVie's designated in-house attorneys, with access to Alvotech's aBLA.

**ANSWER**:

Defendant admits that the exchange of information pursuant to the procedures outlined in the BPCIA began in November 2020 and that on November 5, 2020, Defendant's subsidiary Alvotech USA provided AbbVie Inc. with BLA No. 761205, totaling 118,846 pages of documents. Defendant further admits that Alvotech USA also provided AbbVie Inc. with hundreds of additional manufacturing documents, totaling over 25,000 pages, including batch and laboratory records. Defendant denies the remaining allegations in paragraph 45.

46.     On January 4, 2021, pursuant to 42 U.S.C. § 262(*l*)(3)(A), AbbVie provided Alvotech with its list of patents for which it believed a claim of patent infringement could be reasonably asserted against Alvotech's aBLA Product ("AbbVie's 3A List"). This list identified 63 patents from among the more than 100 patents in the HUMIRA® estate. AbbVie also asked that "[i]n the event that Alvotech asserts that any of the listed patents are either not infringed or invalid pursuant to Section (l)(3)(B)(ii)(I), Alvotech should identify and provide copies of any documentary evidence supporting those assertions to AbbVie's outside counsel . . . so that AbbVie may fully consider it."

**ANSWER**:

Defendant admits that its subsidiary Alvotech USA received a letter from AbbVie Inc. dated January 4, 2021 identifying 63 patents purportedly pursuant to 42 U.S.C. § 262(*l*)(3)(A), and that letter speaks for itself. Defendant denies the remaining allegations in paragraph 46.

47.     Despite having a sixty day statutory period to evaluate AbbVie's 3A List, just ten days later, on January 14, 2021, Alvotech responded by providing AbbVie with statements pursuant to 42 U.S.C. § 262(*l*)(3)(B) contesting Alvotech's infringement of certain patents and the validity of those patents. Despite AbbVie's requests, Alvotech did not provide any additional evidence (*e.g.,* additional manufacturing documents or product information beyond that contained in the aBLA) relating to its non-infringement contentions. This lack of information was

compounded by the fact that for several patents, Alvotech failed to provide any support for its non-infringement positions.

**ANSWER**:

Defendant admits that on January 14, 2021 and pursuant to 42 U.S.C. § 262(*l*)(3)(B), counsel for its subsidiary Alvotech USA provided counsel for AbbVie Inc. with detailed statements, including over 6,000 pages of explanation and claim charts, with citations to Alvotech USA's AVT02 BLA and manufacturing documents, that describe on a claim by claim basis for each of the 63 patents, the factual and legal basis why each claim of the 63 patents is invalid, unenforceable, and/or will not be infringed by the commercial marketing of AVT02 ("Alvotech USA's 3B statement"). Defendant denies the remaining allegations in paragraph 47.

48. On March 15, 2021, AbbVie provided Alvotech with its detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(C) (AbbVie's "3C Statement"). AbbVie's nearly 2,000-page 3C Statement shows that AbbVie reasonably believes that the Alvotech aBLA Product, AVT02, would infringe the following 62 AbbVie patents (AbbVie removed one of the patents from its prior list) and that those patent claims are valid and enforceable:

| | U.S. Patent No. | Lead Inventor | Title |
|---|---|---|---|
| 1. | 6,805,686 | Fathallah | Autoinjector with Extendable Needle Protector Shroud |
| 2. | 8,231,876 | Wan | Purified Antibody Composition |
| 3. | 8,420,081 | Fraunhofer | Antibody Formulations and Methods of Making Same |
| 4. | 8,663,945 | Pla | Methods of Producing Anti-TNF-Alpha Antibodies in Mammalian Cell Culture |
| 5. | 8,708,968 | Julian | Removal of Needle Shields from Syringes and Automatic Injection Devices |
| 6. | 8,715,664 | Hoffman | Use of Human TNFα Antibodies for Treatment of Erosive Polyarthritis |
| 7. | 8,808,700 | Hoffman | Use of TNF Alpha Inhibitor for Treatment of Erosive Polyarthritis |
| 8. | 8,883,156 | Wan | Purified Antibody Composition |
| 9. | 8,889,136 | Hoffman | Multiple-Variable Dose Regimen for Treating TNFα-Related Disorders |
| 10. | 8,895,009 | Wan | Purified Antibody Composition |
| 11. | 8,906,372 | Wan | Purified Antibody Composition |

| 12. | 8,906,373 | Banerjee | Use of TNF-Alpha Inhibitor for Treatment of Psoriasis |
|-----|-----------|----------|-------------------------------------------------------|
| 13. | 8,906,646 | Pla | Fed-Batch Method of Making Human Anti-TNF-Alpha Antibody |
| 14. | 8,911,737 | Fischkoff | Methods of Administering Anti-TNFα Antibodies |
| 15. | 8,911,964 | Pla | Fed-Batch Method of Making Human Anti-TNF-Alpha Antibody |
| 16. | 8,916,153 | Wan | Purified Antibody Composition |
| 17. | 8,926,975 | Wong | Method of Treating Ankylosing Spondylitis |
| 18. | 8,961,973 | Hoffman | Multiple-Variable Dose Regimen for Treating TNFα-Related Disorders |
| 19. | 8,961,974 | Hoffman | Multiple-Variable Dose Regimen for Treating TNFα-Related Disorders |
| 20. | 8,974,790 | Fischkoff | Methods of Administering Anti-TNFα Antibodies |
| 21. | 8,986,693 | Hoffman | Use of TNFα Inhibitor for Treatment of Psoriasis |
| 22. | 8,992,926 | Fischkoff | Methods of Administering Anti-TNFα Antibodies |
| 23. | 8,999,337 | Medich | Methods for Treating Juvenile Idiopathic Arthritis by Inhibition of TNFα |
| 24. | 9,061,005 | Hoffman | Multiple-Variable Dose Regimen for Treating Idiopathic Inflammatory Bowel Disease |
| 25. | 9,062,106 | Bengea | Methods for Controlling the Galactosylation Profile of Recombinantly-Expressed Proteins |
| 26. | 9,067,992 | Hoffman | Use of TNFα Inhibitor for Treatment of Psoriatic Arthritis |
| 27. | 9,085,618 | Ramasubramanyan | Low Acidic Species Compositions and Methods for Producing and Using the Same |
| 28. | 9,085,619 | Fraunhofer | Anti-TNF Antibody Formulations |
| 29. | 9,085,620 | Hoffman | Use of TNFα Inhibitor for Treatment of Psoriatic Arthritis |
| 30. | 9,090,688 | Bengea | Methods for Controlling the Galactosylation Profile of Recombinantly-Expressed Proteins |
| 31. | 9,090,689 | Hoffman | Use of TNFα Inhibitor for Treatment of Psoriasis |
| 32. | 9,090,867 | Pla | Fed-Batch Method of Making Anti-TNF-Alpha Antibody |
| 33. | 9,096,666 | Wan | Purified Antibody Composition |

| 34. | 9,102,723 | Wan | Purified Antibody Composition |
|---|---|---|---|
| 35. | 9,150,645 | Subramanian | Cell Culture Methods to Reduce Acidic Species |
| 36. | 9,181,337 | Subramanian | Modulated Lysine Variant SpeciesCompositions and Methods for Producing and Using the Same |
| 37. | 9,181,572 | Subramanian | Methods to Modulate Lysine Variant Distribution |
| 38. | 9,187,559 | Hoffman | Multiple-Variable Dose Regimen for Treating Idiopathic Inflammatory Bowel Disease |
| 39. | 9,234,032 | Pla | Fed-Batch Methods for Producing Adalimumab |
| 40. | 9,266,949 | Ramasubramanyan | Low Acidic Species Compositions and Methods for Producing and Using the Same |
| 41. | 9,273,132 | Wan | Purified Antibody Composition |
| 42. | 9,284,370 | Medich | Methods for Treating Juvenile Idiopathic Arthritis |
| 43. | 9,284,371 | Pla | Methods of Producing Adalimumab |
| 44. | 9,290,568 | Rives | Methods to Control Protein Heterogeneity |
| 45. | 9,315,574 | Ramasubramanyan | Low Acidic Species Compositions and Methods for Producing and Using the Same |
| 46. | 9,328,165 | Wan | Purified Antibody Composition |
| 47. | 9,334,319 | Ramasubramanyan | Low Acidic Species Compositions |
| 48. | 9,339,610 | Julian | Removal of Needle Shield From Syringes and Automatic Injection Devices |
| 49. | 9,346,879 | Ramasubramanyan | Protein Purification Methods to Reduce Acidic Species |
| 50. | 9,359,434 | Subramanian | Cell Culture Methods to Reduce Acidic Species |
| 51. | 9,499,614 | Hossler | Methods for Modulating Protein Glycosylation Profiles of Recombinant Protein Therapeutics Using Monosaccharides and Oligosaccharides |
| 52. | 9,499,616 | Subramanian | Modulated Lysine Variant Species Compositions and Methods for Producing and Using the Same |
| 53. | 9,505,834 | Bengea | Methods for Controlling the Galactosylation Profile of Recombinantly-Expressed Proteins |
| 54. | 9,512,216 | Hoffman | Use of TNFα Inhibitor |

| 55. | 9,522,953 | Ramasubramanyan | Low Acidic Species Compositions and Methods for Producing and Using the Same |
| 56. | 9,546,212 | Fischkoff | Methods of Administering Anti-TNFα Antibodies |
| 57. | 9,550,826 | Labkovsky | Glycoengineered Binding Protein Compositions |
| 58. | 9,624,295 | Medich | Uses and Compositions for Treatment of Psoriatic Arthritis |
| 59. | 9,669,093 | Medich | Methods for Treating Juvenile Idiopathic Arthritis |
| 60. | 9,683,033 | Subramanian | Cell Culture Methods to Reduce Acidic Species |
| 61. | 9,708,400 | Subramanian | Methods to Modulate Lysine Variant Distribution |
| 62. | 9,957,318 | Ramasubramanyan | Protein Purification Methods to Reduce Acidic Species |

**ANSWER**:

To the extent paragraph 48 implicates a legal conclusion, no response is required. To the extent a response is required, Defendant admits that on March 15, 2021, counsel for Plaintiffs purported to respond to Alvotech USA's 3B statement ("the 3C statement"), but Defendant denies that AbbVie Inc. satisfied its statutory obligations under § 262(*l*)(3)(C). Defendant denies the remaining allegations in paragraph 48.

49.     After AbbVie provided its 3C Statement, on March 23, 2021, Alvotech proposed that only four of the 62 patents, namely U.S. Pat. Nos. 8,420,081, 8,926,975, 8,961,973, and 9,085,619, be the subject of the 42 U.S.C. § 262(*l*)(6) suit. Alvotech had the right under the BPCIA to select all 62 patents, or any subset of those patents it wanted, but instead proposed litigating just four in this first round of litigation.

**ANSWER**:

To the extent paragraph 49 implicates a legal conclusion, no response is required. To the extent a response is required, Defendant admits that notwithstanding AbbVie Inc.'s deficiencies, starting no later than March 17, 2021, Defendant's subsidiary Alvotech USA engaged in good faith negotiations under 42 U.S.C. § 262(*l*)(4)(A) to identify patents on AbbVie's 3A List that should

be the subject of "the immediate patent infringement action" authorized under 42 U.S.C. § 262(*l*)(6), and on March 23, 2021, counsel for Defendant's subsidiary Alvotech USA proposed fairly limiting a litigation to the following four patents:  U.S. Patent Nos. 8,420,081; 8,926,975; 8,961,973; and 9,085,619.  Defendant denies the remaining allegations in paragraph 49.

50.     On March 29, 2021, AbbVie wrote to Alvotech, explaining that litigating only these four patents would not resolve all issues of patent infringement with respect to the Alvotech aBLA Product and that, unless Alvotech chose to include them in the first phase of litigation, the remaining patents would still need to be addressed in a second phase of litigation as contemplated by the BPCIA. *See* 42 U.S.C. § 262(*l*)(8). Despite this express notice, Alvotech chose to move forward with only four patents as the subject of the initial 42 U.S.C. § 262(*l*)(6) litigation.

**ANSWER**:

Defendant admits that on March 29, 2021, counsel for AbbVie wrote to counsel for Defendant's subsidiary Alvotech USA stating "if Alvotech wants to resolve *all* issues in round 1, it needs to pick *all* patents," despite failing to propose additional patents to litigate beyond the four proposed by Alvotech USA.  Defendant denies the remaining allegations in paragraph 50.

51.     Consequently, AbbVie will have a second opportunity, if and when Alvotech provides a 180-day Notice of Commercial Marketing (or as circumstances otherwise warrant), to assert its remaining patents. So, while Alvotech's tactics may create delay, it still must face AbbVie's other patents before going to market.

**ANSWER**:

Defendant does not have knowledge or information sufficient to respond to the allegations regarding Plaintiffs in paragraph 51 and therefore denies them.  Defendant denies the remaining allegations in paragraph 51.

## THE ALVOTECH aBLA PRODUCT

52.     Alvotech has undertaken the development of a proposed biosimilar to AbbVie's HUMIRA® (adalimumab) product.

**ANSWER**:

Defendant admits that Alvotech hf. and its subsidiaries have developed AVT02, a proposed biosimilar to Humira® (adalimumab). Defendant denies the remaining allegations of paragraph 52.

53. Alvotech has submitted an aBLA to the FDA seeking approval to market in the United States a biosimilar version of AbbVie's HUMIRA® adalimumab product.

**ANSWER**:

To the extent paragraph 53 implicates a legal conclusion regarding "submitted," no response is required. To the extent a response is required, Defendant admits that its subsidiary Alvotech USA applied to the FDA seeking approval to market in the United States a biosimilar version of AbbVie Inc.'s Humira® (adalimumab) product. Defendant denies any remaining allegations in paragraph 53.

54. On November 19, 2020, Alvotech publicly announced that the FDA had accepted its submission of an aBLA with the FDA for AVT02, a biosimilar candidate to HUMIRA® (adalimumab). *See* Exhibit 5.

**ANSWER**:

Defendant admits that the document cited in paragraph 54 is dated November 19, 2020, refers to the acceptance of the AVT02 BLA by the FDA, and that document speaks for itself. Defendant denies the remaining allegations in paragraph 54.

55. Alvotech stated that "AVT02 is a monoclonal antibody (mAb) and a proposed biosimilar to HUMIRA® (adalimumab)" and that "AVT02 is highly similar to its reference product in terms of structure and function." *See id.* Alvotech further stated that "AVT02 is a proposed biosimilar to the reference product HUMIRA® (adalimumab) with high concentration (100mg/mL) dosage forms . . . matching the newest dosage forms of the reference product." *Id.*

**ANSWER**:

Defendant admits that the document cited in paragraph 55 includes the quoted language. Defendant denies the remaining allegations in paragraph 55.

26

56.     Alvotech stated that its "filings were based on the results of a comprehensive development program and data package comprising of a totality of evidence demonstrating a high degree of similarity of AVT02 compared to its reference product." *See id.*

**ANSWER**:

Defendant admits that the document cited in paragraph 56 includes the quoted language.

Defendant denies the remaining allegations in paragraph 56.

57.     Alvotech has completed clinical trials with AVT02, testing its use in subjects with moderate to severe chronic psoriasis and has relied on these clinical trials to support Alvotech's aBLA. *See* Exhibit 8; *see also* Exhibit 9.  Alvotech is also sponsoring ongoing clinical trials testing the use of AVT02 in subjects with moderate to severe active rheumatoid arthritis.

**ANSWER**:

Defendant admits that clinical trials have been conducted with regard to the use of AVT02

for the treatment of moderate to severe chronic psoriasis and data from those clinical trials was

submitted in connection with the AVT02 BLA.  Defendant further admits that clinical trials with

regard to the use of AVT02 for the treatment of moderate to severe active rheumatoid arthritis are

ongoing.  Defendant denies the remaining allegations in paragraph 57.

58.     The FDA has not yet approved Alvotech's proposed biosimilar product.

**ANSWER**:

Defendant admits that as of the date Plaintiffs' filing their complaint, the FDA has yet to

approve AVT02.  Defendant denies any remaining allegations in paragraph 58.

59.     Alvotech has committed a statutory act of patent infringement under 35 U.S.C. § 271(e)(2)(C) by submitting an application seeking approval of a biological product with respect to patents identified by AbbVie pursuant to 42 U.S.C. § 262(*l*)(3)(A)(i).

**ANSWER**:

Denied.

27

## ABBVIE'S ADALIMUMAB PATENTS

60.     AbbVie identified 62 patents that it reasonably believes would be infringed by Alvotech's biosimilar product, including its administration, its formulation, and the processes for manufacturing it.

**ANSWER**:

Defendant admits that AbbVie Inc. purports to have identified to Alvotech USA, the BLA applicant, 63 patents pursuant to 42 U.S.C. § 262(*l*)(3).  Defendant does not have knowledge or information sufficient to respond to the allegations regarding AbbVie and therefore denies them. Defendant denies the remaining allegations in paragraph 60.

61.     Because of Alvotech's selections during the BPCIA process, AbbVie is limited at this stage to asserting the following four patents in the present lawsuit:  U.S. Patent No. 8,420,081; 8,926,975; 8,961,973; and 9,085,619 (the "AbbVie Patents").

**ANSWER**:

Defendant admits that AbbVie Inc. is limited to asserting U.S. Patent Nos. 8,420,081; 8,926,975; 8,961,973; and 9,085,619 in this lawsuit.  Defendant further denies the limitation is because of Alvotech USA's selections during the BPCIA process.  Defendant denies the remaining allegations in paragraph 61.

62.     AbbVie asserts the following four patents in this suit.

**ANSWER**:

Defendant admits that Plaintiffs purport to assert infringement of U.S. Patent Nos. 8,420,081; 8,926,975; 8,961,973; and 9,085,619 against Alvotech hf. in this lawsuit.  Defendant denies Plaintiffs are entitled to any relief pursuant to their claims.

### U.S. Patent No. 8,420,081

63.     U.S. Patent No. 8,420,081 (the "'081 patent"), titled "Antibody Formulations and Methods of Making Same," was duly and legally issued by the USPTO on April 16, 2013. A true and correct copy of the '081 patent is attached as Exhibit 10.

**ANSWER**:

Defendant admits that on April 16, 2013, the '081 patent, titled "Antibody Formulations and Methods of Making Same," was issued by the USPTO, and that Exhibit 10 appears to be a copy of the '081 patent. Defendant denies the remaining allegations in paragraph 63.

64. ABL is the owner by assignment of the '081 patent. AbbVie Inc. is exclusively licensed to offer for sale, sell, or have sold through distributors products that would infringe the '081 patent in the United States. ABL and AbbVie Inc. together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '081 patent.

**ANSWER**:

Defendant admits that AbbVie Inc. is listed as the assignee on the face of the '081 patent. Defendant does not have knowledge or information sufficient to respond to the remaining allegations in paragraph 64 and therefore denies them.

65. A related family member of the '081 patent, U.S. Patent No. 9,085,619 (see Count IV), was previously subject to four separate IPR challenges before the PTAB (IPR2017-01008, IPR2017-01009, IPR2017-00822, and IPR2017-00823) and its validity was upheld after every challenge.

**ANSWER**:

Defendant admits that third parties have filed IPR petitions requesting review of patents relating to adalimumab. Defendant denies the remaining allegations in paragraph 65.

66. AbbVie included the '081 patent in its disclosures to Alvotech, pursuant to 42 U.S.C. § 262(*l*)(3)(A), as described in Count I below.

**ANSWER**:

Defendant admits that AbbVie Inc. included the '081 patent in its disclosures to Defendant's subsidiary Alvotech USA purportedly made pursuant to 42 U.S.C. § 262(*l*)(3)(A), but Defendant denies that AbbVie Inc. satisfied its statutory obligation under § 262(*l*)(3)(C). Defendant denies the remaining allegations in paragraph 66.

29

67.     AbbVie has provided to Alvotech, pursuant to confidential exchanges under U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for each of the claims described in Count I below.

**ANSWER**:

Defendant admits that AbbVie Inc. purported to provide responses pursuant to 42 U.S.C. § 262(*l*)(3)(C) for certain claims of the '081 patent, but Defendant denies that AbbVie Inc. satisfied its statutory obligation under § 262(*l*)(3)(C).  Defendant denies the remaining allegations in paragraph 66.

### U.S. Patent No. 8,926,975

68.     U.S. Patent No. 8,926,975 (the "'975 patent"), titled "Method of Treating Ankylosing Spondylitis," was duly and legally issued by the USPTO on January 6, 2015. A true and correct copy of the '975 patent is attached as Exhibit 11.

**ANSWER**:

Defendant admits that on January 6, 2015, the '975 patent, titled "Method of Treating Ankylosing Spondylitis," was issued by the USPTO, and that Exhibit 11 appears to be a copy of the '975 patent.  Defendant denies the remaining allegations in paragraph 68.

69.     ABL is the owner by assignment of the '975 patent. AbbVie Inc. is exclusively licensed to offer for sale, sell, or have sold through distributors products that would infringe the '975 patent in the United States.  AbbVie Inc. and ABL together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '975 patent.

**ANSWER**:

Defendant admits that AbbVie Biotechnology Ltd. is listed as the assignee on the face of the '975 patent.  Defendant does not have knowledge or information sufficient to respond to the remaining allegations in paragraph 69 and therefore denies them.

70.     AbbVie included the '975 patent in its disclosures to Alvotech, pursuant to 42 U.S.C. § 262(*l*)(3)(A), as described in Count II below.

**ANSWER**:

Defendant admits that AbbVie Inc. included the '975 patent in its disclosures to Defendant's subsidiary Alvotech USA purportedly made pursuant to 42 U.S.C. § 262(*l*)(3)(A). Defendant denies the remaining allegations in paragraph 70.

71.     AbbVie has provided to Alvotech, pursuant to confidential exchanges under U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for each of the claims described in Count II below.

**ANSWER**:

Defendant admits that AbbVie Inc. purported to provide responses pursuant to 42 U.S.C. § 262(*l*)(3)(C) for certain claims of the '975 patent, but Defendant denies that AbbVie Inc. satisfied its statutory obligation under § 262(*l*)(3)(C). Defendant denies the remaining allegations in paragraph 71.

### U.S. Patent No. 8,961,973

72.     U.S. Patent No. 8,961,973 (the "'973 patent"), titled "Multiple-Variable Dose Regimen for Treating TNFα-Related Disorders," was duly and legally issued by the USPTO on February 24, 2015. A true and correct copy of the '973 patent is attached as Exhibit 12.

**ANSWER**:

Defendant admits that on February 24, 2015, the '973 patent, titled "Multiple-Variable Dose Regimen for Treating TNFα-Related Disorders," was issued by the USPTO, and that Exhibit 12 appears to be a copy of the '973 patent. Defendant denies the remaining allegations in paragraph 72.

73.     ABL is the owner by assignment of the '973 patent. AbbVie Inc. is exclusively licensed to offer for sale, sell, or have sold through distributors products that would infringe the '973 patent in the United States. AbbVie Inc. and ABL together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '973 patent.

**ANSWER**:

Defendant admits that AbbVie Biotechnology Ltd. is listed as the assignee on the face of the '973 patent. Defendant does not have knowledge or information sufficient to respond to the remaining allegations in paragraph 73 and therefore denies them.

74. A related family member of the '973 patent, U.S. Patent No. 9,187,559, was previously subject to a separate IPR challenge before the PTAB (IPR2018-00156) and its validity was upheld.

**ANSWER**:

Defendant admits that U.S. Patent No. 9,187,559 was subject to an IPR challenge brought by Sandoz Inc., for which the PTAB denied institution of *inter partes* review. Defendant denies the remaining allegations in paragraph 74.

75. AbbVie included the '973 patent in its disclosures to Alvotech, pursuant to 42 U.S.C. § 262(*l*)(3)(A), as described in Count III below.

**ANSWER**:

Defendant admits that AbbVie Inc. included the '973 patent in its disclosures to Defendant's subsidiary Alvotech USA purportedly made pursuant to 42 U.S.C. § 262(*l*)(3)(A). Defendant denies the remaining allegations in paragraph 6675

76. AbbVie has provided to Alvotech, pursuant to confidential exchanges under U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for each of the claims described in Count III below.

**ANSWER**:

Defendant admits that AbbVie Inc. purported to provide responses pursuant to 42 U.S.C. § 262(*l*)(3)(C) for certain claims of the '973 patent, but Defendant denies that AbbVie Inc. satisfied its statutory obligation under § 262(*l*)(3)(C). Defendant denies the remaining allegations in paragraph 76.

## U.S. Patent No. 9,085,619

77. U.S. Patent No. 9,085,619 (the "'619 patent"), titled "Anti-TNF Antibody Formulations," was duly and legally issued by the USPTO on July 21, 2015. A true and correct copy of the '619 patent is attached as Exhibit 13.

**ANSWER**:

Defendant admits that on July 21, 2015, the '619 patent, titled "Anti-TNF Antibody Formulations," was issued by the USPTO, and that Exhibit 13 appears to be a copy of the '619 patent. Defendant denies the remaining allegations in paragraph 77.

78. ABL is the owner by assignment of the '619 patent. AbbVie Inc. is exclusively licensed to offer for sale, sell, or have sold through distributors products that would infringe the '619 patent in the United States. AbbVie Inc. and ABL together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '619 patent.

**ANSWER**:

Defendant admits that AbbVie Biotechnology Ltd. is listed as the assignee on the face of the '619 patent. Defendant does not have knowledge or information sufficient to respond to the remaining allegations in paragraph 78 and therefore denies them.

79. The '619 patent was previously subject to four separate IPR challenges before the PTAB (IPR2017-01008, IPR2017-01009, IPR2017-00822, and IPR2017-00823) and its validity was upheld after every challenge.

**ANSWER**:

Defendant admits that third parties have filed IPR petitions requesting review of patents relating to adalimumab. Defendant denies the remaining allegations in paragraph 79.

80. AbbVie included the '619 patent in its disclosures to Alvotech, pursuant to 42 U.S.C. § 262(*l*)(3)(A), as described in Count IV below.

**ANSWER**:

Defendant admits that AbbVie Inc. included the '619 patent in its disclosures to Defendant's subsidiary Alvotech USA purportedly made pursuant to 42 U.S.C. § 262(*l*)(3)(A). Defendant denies the remaining allegations in paragraph 80.

81.     AbbVie has provided to Alvotech, pursuant to confidential exchanges under U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for each of the claims described in Count IV below.

**ANSWER**:

Defendant admits that AbbVie Inc. purported to provide responses pursuant to 42 U.S.C. § 262(*l*)(3)(C) for certain claims of the '619 patent, but Defendant denies that AbbVie Inc. satisfied its statutory obligation under § 262(*l*)(3)(C).  Defendant denies the remaining allegations in paragraph 81.

**ANSWER TO COUNT I**

**(Alleged Infringement of U.S. Patent No. 8,420,081)**

82.     AbbVie incorporates by reference each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:

No response is required to the incorporation by reference of the preceding paragraphs.  To the extent a response is required, Defendant re-alleges and incorporates by reference each of its foregoing responses as if fully set forth herein.

83.     On information and belief, in late August or early September 2020, Alvotech submitted an aBLA to the FDA seeking approval for the commercial manufacture, use, offer for sale, sale, and/or importation of the Alvotech aBLA Product, a biosimilar version of adalimumab. The reference product for adalimumab is BLA No. 125057.  AbbVie Inc. is the holder of BLA No. 125057.

**ANSWER**:

Defendant admits that on September 4, 2020, its subsidiary Alvotech USA applied to the FDA for licensure of AVT02, a biosimilar to Humira® (adalimumab).  Defendant admits that the reference product for AVT02 is Humira® (adalimumab), BLA No. 125057.  On information and belief, Defendant admits that BLA No. 125057 is held by Plaintiff AbbVie Inc.  Defendant denies the remaining allegations in paragraph 83.

84.     Alvotech represents that the FDA accepted Alvotech's aBLA for the Alvotech aBLA Product for review on or before November 5, 2020.

**ANSWER**:

Defendant admits that on November 5, 2020, the FDA notified Defendant's subsidiary Alvotech USA that Alvotech's application was sufficiently complete to permit substantive review by the FDA. Defendant denies the remaining allegations in paragraph 84.

85.     On November 5, 2020, Alvotech provided AbbVie with a copy of its aBLA.

**ANSWER**:

Defendant admits that on November 5, 2020, Defendant's subsidiary Alvotech US provided AbbVie Inc. with the AVT02 BLA application and voluminous other information required under 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 85.

86.     On information and belief, Alvotech intends to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product promptly upon receiving FDA approval to do so.

**ANSWER**:

Defendant admits that it will manufacture AVT02 in Iceland and that AVT02 will be used, sold, offered for sale, and/or imported in the U.S. after the FDA approves the AVT02 BLA. Defendant denies the remaining allegations in paragraph 86.

87.     Based on confidential information disclosed to AbbVie by Alvotech pursuant to 42 U.S.C. § 262(*l*)(2), Alvotech's submission of its aBLA to obtain approval to engage in the commercial manufacture, use, sale, offer to sell, and/or importation of the Alvotech aBLA Product prior to the expiration of the '081 patent is an act of infringement of one or more of the claims of the '081 patent under 35 U.S.C. § 271(e)(2)(C), either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

88.     Alvotech has provided information to AbbVie pursuant to 42 U.S.C. § 262(*l*)(2)(A) relating to the indications, dosage, and methods of use for the Alvotech aBLA Product. Based on

this confidential information, Alvotech's commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product (either directly or through any affiliates, subsidiaries, and/or agents), once the aBLA is approved by the FDA, will infringe, actively induce infringement by others, or contribute to the infringement by others of at least claims 25, 33, 57-61, 63-67, 84, 86-89, 91-93, and 95-99 of the '081 patent under 35 U.S.C. §§ 271(a)-(c), either literally or under the doctrine of equivalents. AbbVie has provided to Alvotech, pursuant to U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for claims 25, 33, 57-61, 63-67, 84, 86-89, 91-93, and 95-99 of the '081 patent. For at least one claim, however, Alvotech's failure to provide sufficient manufacturing information, as required by the BPCIA, has prevented AbbVie from learning relevant facts that could further support AbbVie's allegation of infringement of the '081 patent.

**ANSWER**:

Defendant admits that its subsidiary Alvotech USA provided AbbVie Inc. with information relating to the indications, dosage, and methods of use of AVT02 pursuant to 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 88.

89. On information and belief, Alvotech is aware, has knowledge, and/or is willfully blind to the fact that the formulation of the Alvotech aBLA Product directly infringes at least one claim of the '081 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

90. Alvotech has knowledge of and is aware of the '081 patent, including due to AbbVie's disclosure of patents pursuant to 42 U.S.C. § 262(*l*)(3)(A) and to the filing of this Complaint.

**ANSWER**:

Admitted.

91. AbbVie will suffer irreparable injury for which damages are an inadequate remedy unless Alvotech is enjoined from infringing the claims of the '081 patent.

**ANSWER**:

Denied.

92. AbbVie seeks an injunction pursuant to at least 35 U.S.C. § 271(e)(4)(B) preventing Alvotech from the commercial manufacture, use, sale, offer for sale within and/or importation into the United States of the Alvotech aBLA Product.

**ANSWER**:

Defendant admits that Plaintiffs purport to seek an injunction pursuant to 35 U.S.C. § 271(e)(4)(B). Defendant denies Plaintiffs are entitled to any relief pursuant to their claims including injunctive relief, in the least because one who seeks equity must do equity. *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.").

## ANSWER TO COUNT II

### (Alleged Infringement of U.S. Patent No. 8,926,975)

93.    AbbVie incorporates by reference each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:

No response is required to the incorporation by reference of the preceding paragraphs. To the extent a response is required, Defendant re-alleges and incorporates by reference each of its foregoing responses as if fully set forth herein.

94.    On information and belief, in late August or early September 2020, Alvotech submitted an aBLA to the FDA seeking approval for the commercial manufacture, use, offer for sale, sale, and/or importation of the Alvotech aBLA Product, a biosimilar version of adalimumab. The reference product for adalimumab is BLA No. 125057. AbbVie Inc. is the holder of BLA No. 125057.

**ANSWER**:

Defendant admits that on September 4, 2020, its subsidiary Alvotech USA applied to the FDA for licensure of AVT02, a biosimilar to Humira® (adalimumab). Defendant admits that the reference product for AVT02 is Humira® (adalimumab), BLA No. 125057. On information and belief, Defendant admits that BLA No. 125057 is held by Plaintiff AbbVie Inc. Defendant denies the remaining allegations in paragraph 94.

95.    Alvotech represents that the FDA accepted Alvotech's aBLA for the Alvotech aBLA Product for review on or before November 5, 2020.

**ANSWER**:

Defendant admits that on November 5, 2020, the FDA notified Defendant's subsidiary Alvotech USA that Alvotech's application was sufficiently complete to permit substantive review by the FDA. Defendant denies the remaining allegations in paragraph 95.

96. On November 5, 2020, Alvotech provided AbbVie with a copy of its aBLA.

**ANSWER**:

Defendant admits that on November 5, 2020, Defendant's subsidiary Alvotech US provided AbbVie Inc. with the AVT02 BLA application and voluminous other information required under 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 96.

97. On information and belief, Alvotech intends to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product promptly upon receiving FDA approval to do so.

**ANSWER**:

Defendant admits that it will manufacture AVT02 in Iceland and that AVT02 will be used, sold, offered for sale, and/or imported in the U.S. after the FDA approves the AVT02 BLA. Defendant denies the remaining allegations in paragraph 97.

98. Based on confidential information disclosed to AbbVie by Alvotech pursuant to 42 U.S.C. § 262(*l*)(2), Alvotech's submission of its aBLA to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of the Alvotech aBLA Product prior to the expiration of the '975 patent is an act of infringement of one or more of the claims of the '975 patent under 35 U.S.C. § 271(e)(2)(C), either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

99. Alvotech has provided information to AbbVie pursuant to 42 U.S.C. § 262(*l*)(2)(A) relating to the indications, dosage, and methods of use for the Alvotech aBLA Product. Based on this confidential information and on information and belief, Alvotech's commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product (either directly or through any affiliates, subsidiaries, and/or agents), once the aBLA is approved by the FDA, will

actively induce infringement by others or contribute to infringement by others of at least claims 1-6 of the '975 patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents. AbbVie has provided to Alvotech, pursuant to U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for claims 1-6 of the '975 patent.

**ANSWER**:

Defendant admits that its subsidiary Alvotech USA provided AbbVie Inc. with information relating to the indications, dosage, and methods of use of AVT02 pursuant to 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 99.

100.    On information and belief, Alvotech has an affirmative intent to actively induce or contribute to infringement by others of one or more claims of the '975 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

101.    On information and belief, Alvotech is aware, has knowledge, and/or is willfully blind to the fact that patients will administer and/or use and medical practitioners will prescribe and/or administer the Alvotech aBLA Product to directly infringe at least claims 1-6 of the '975 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

102.    On information and belief, Alvotech will knowingly or with willful blindness induce or contribute to another's direct infringement of at least claims 1-6 of the '975 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

103.    Alvotech has knowledge of and is aware of the '975 patent, including due to AbbVie's disclosure of patents pursuant to 42 U.S.C. § 262(*l*)(3)(A) and to the filing of this Complaint.

**ANSWER**:

Admitted.

104.    AbbVie will suffer irreparable injury for which damages are an inadequate remedy unless Alvotech is enjoined from infringing the claims of the '975 patent.

**ANSWER**:

Denied.

105.    AbbVie seeks an injunction pursuant to at least 35 U.S.C. § 271(e)(4)(B) preventing Alvotech from the commercial manufacture, use, sale, offer for sale within and/or importation into the United States of the Alvotech aBLA Product.

**ANSWER**:

Defendant admits that Plaintiffs purport to seek an injunction pursuant to 35 U.S.C. § 271(e)(4)(B).  Defendant denies Plaintiffs are entitled to any relief pursuant to their claims including injunctive relief, in the least because one who seeks equity must do equity.  *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.").

## ANSWER TO COUNT III

### (Alleged Infringement of U.S. Patent No. 8,961,973)

106.    AbbVie incorporates by reference each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:

No response is required to the incorporation by reference of the preceding paragraphs.  To the extent a response is required, Defendant re-alleges and incorporates by reference each of its foregoing responses as if fully set forth herein.

107.    On information and belief, in late August or early September 2020, Alvotech submitted an aBLA to the FDA seeking approval for the commercial manufacture, use, offer for sale, sale, and/or importation of the Alvotech aBLA Product, a biosimilar version of adalimumab. The reference product for adalimumab is BLA No. 125057.  AbbVie Inc. is the holder of BLA No. 125057.

**ANSWER**:

Defendant admits that on September 4, 2020, its subsidiary Alvotech USA applied to the FDA for licensure of AVT02, a biosimilar to Humira® (adalimumab). Defendant admits that the reference product for AVT02 is Humira® (adalimumab), BLA No. 125057. On information and belief, Defendant admits that BLA No. 125057 is held by Plaintiff AbbVie Inc. Defendant denies the remaining allegations in paragraph 107.

108. Alvotech represents that the FDA accepted Alvotech's aBLA for the Alvotech aBLA Product for review on or before November 5, 2020.

**ANSWER**:

Defendant admits that on November 5, 2020, the FDA notified Defendant's subsidiary Alvotech USA that Alvotech's application was sufficiently complete to permit substantive review by the FDA. Defendant denies the remaining allegations in paragraph 108.

109. On November 5, 2020, Alvotech provided AbbVie with a copy of its aBLA.

**ANSWER**:

Defendant admits that on November 5, 2020, Defendant's subsidiary Alvotech US provided AbbVie Inc. with the AVT02 BLA application and voluminous other information required under 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 109.

110. On information and belief, Alvotech intends to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product promptly upon receiving FDA approval to do so.

**ANSWER**:

Defendant admits that it will manufacture AVT02 in Iceland and that AVT02 will be used, sold, offered for sale, and/or imported in the U.S. after the FDA approves the AVT02 BLA. Defendant denies the remaining allegations in paragraph 110.

111. Based on confidential information disclosed to AbbVie by Alvotech pursuant to 42 U.S.C. § 262(*l*)(2), Alvotech's submission of its aBLA to obtain approval to engage in the commercial manufacture, use, offer to sell, sale, and/or importation of the Alvotech aBLA Product prior to the expiration of the '973 patent is an act of infringement of one or more of the claims of the '973 patent under 35 U.S.C. § 271(e)(2)(C), either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

112. Alvotech has provided information to AbbVie pursuant to 42 U.S.C. § 262(*l*)(2)(A) relating to the indications, dosage, and methods of use for the Alvotech aBLA Product. Based on this confidential information and on information and belief, Alvotech's commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product (either directly or through any affiliates, subsidiaries, and/or agents), once the aBLA is approved by the FDA, will actively induce infringement by others or contribute to infringement by others of at least claims 1-30 of the '973 patent under 35 U.S.C. §§ 271(b) and (c), either literally or under the doctrine of equivalents. AbbVie has provided to Alvotech, pursuant to U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for claims 1-30 of the '973 patent.

**ANSWER**:

Defendant admits that its subsidiary Alvotech USA provided AbbVie Inc. with information

relating to the indications, dosage, and methods of use of AVT02 pursuant to 42 U.S.C.

§ 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 112.

113. On information and belief, Alvotech has an affirmative intent to actively induce or contribute to infringement by others of one or more claims of the '973 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

114. On information and belief, Alvotech is aware, has knowledge, and/or is willfully blind to the fact that patients will administer and/or use and medical practitioners will prescribe and/or administer the Alvotech aBLA Product to directly infringe at least claims 1-30 of the '973 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

115. On information and belief, Alvotech will knowingly or with willful blindness induce or contribute to another's direct infringement of at least claims 1-30 of the '973 patent, either

literally or under the doctrine of equivalents, by at least Alvotech's proposed package insert for the Alvotech aBLA Product.

**ANSWER**:

Denied.

116.    Alvotech has knowledge of and is aware of the '973 patent, including due to AbbVie's disclosure of patents pursuant to 42 U.S.C. § 262(*l*)(3)(A) and to the filing of this Complaint.

**ANSWER**:

Admitted.

117.    AbbVie will suffer irreparable injury for which damages are an inadequate remedy unless Alvotech is enjoined from infringing the claims of the '973 patent.

**ANSWER**:

Denied.

118.    AbbVie seeks an injunction pursuant to at least 35 U.S.C. § 271(e)(4)(B) preventing Alvotech from the commercial manufacture, use, sale, offer for sale within, and/or importation into the United States of the Alvotech aBLA Product.

**ANSWER**:

Defendant admits that Plaintiffs purport to seek an injunction pursuant to 35 U.S.C. § 271(e)(4)(B).  Defendant denies Plaintiffs are entitled to any relief pursuant to their claims including injunctive relief, in the least because one who seeks equity must do equity.  *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.").

### ANSWER TO COUNT IV

**(Alleged Infringement of U.S. Patent No. 9,085,619)**

119.    AbbVie incorporates by reference each of the preceding paragraphs as if fully set forth herein.

**ANSWER**:

No response is required to the incorporation by reference of the preceding paragraphs. To the extent a response is required, Defendant re-alleges and incorporates by reference each of its foregoing responses as if fully set forth herein.

120. On information and belief, in late August or early September 2020, Alvotech submitted an aBLA to the FDA seeking approval for the commercial manufacture, use, offer for sale, sale, and/or importation of the Alvotech aBLA Product, a biosimilar version of adalimumab. The reference product for adalimumab is BLA No. 125057. AbbVie Inc. is the holder of BLA No. 125057.

**ANSWER**:

Defendant admits that on September 4, 2020, its subsidiary Alvotech USA applied to the FDA for licensure of AVT02, a biosimilar to Humira® (adalimumab). Defendant admits that the reference product for AVT02 is Humira® (adalimumab), BLA No. 125057. On information and belief, Defendant admits that BLA No. 125057 is held by Plaintiff AbbVie Inc. Defendant denies the remaining allegations in paragraph 120.

121. Alvotech represents that the FDA accepted Alvotech's aBLA for the Alvotech aBLA Product for review on or before November 5, 2020.

**ANSWER**:

Defendant admits that on November 5, 2020, the FDA notified Defendant's subsidiary Alvotech USA that Alvotech's application was sufficiently complete to permit substantive review by the FDA. Defendant denies the remaining allegations in paragraph 121.

122. On November 5, 2020, Alvotech provided AbbVie with a copy of its aBLA.

**ANSWER**:

Defendant admits that on November 5, 2020, Defendant's subsidiary Alvotech US provided AbbVie Inc. with the AVT02 BLA application and voluminous other information

required under 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 122.

123. On information and belief, Alvotech intends to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product promptly upon receiving FDA approval to do so.

**ANSWER**:

Defendant admits that it will manufacture AVT02 in Iceland and that AVT02 will be used, sold, offered for sale, and/or imported in the U.S. after the FDA approves the AVT02 BLA. Defendant denies the remaining allegations in paragraph 123.

124. Based on confidential information disclosed to AbbVie by Alvotech pursuant to 42 U.S.C. § 262(*l*)(2), Alvotech's submission of its aBLA to obtain approval to engage in the commercial manufacture, use, offer to sell, sale, and/or importation of the Alvotech aBLA Product prior to the expiration of the '619 patent is an act of infringement of one or more of the claims of the '619 patent under 35 U.S.C. § 271(e)(2)(C), either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

125. Alvotech has provided information to AbbVie pursuant to 42 U.S.C. § 262(*l*)(2)(A) relating to the indications, dosage, and methods of use for the Alvotech aBLA Product. Based on this confidential information and on information and belief, Alvotech's commercial manufacture, use, sale, offer for sale, and/or importation of the Alvotech aBLA Product (either directly or through any affiliates, subsidiaries, and/or agents), once the aBLA is approved by the FDA, will infringe or actively induce infringement by others or contribute to infringement by others of at least claims 1-5 and 16-30 of the '619 patent under 35 U.S.C. §§ 271(a)-(c), either literally or under the doctrine of equivalents. AbbVie has provided to Alvotech, pursuant to U.S.C. § 262(*l*)(3)(C), claim-by-claim infringement contentions for claims 1-5 and 16-30 of the '619 patent.

**ANSWER**:

Defendant admits that its subsidiary Alvotech USA provided AbbVie Inc. with information relating to the indications, dosage, and methods of use of AVT02 pursuant to 42 U.S.C. § 262(*l*)(2)(A). Defendant denies the remaining allegations in paragraph 125.

126. On information and belief, Alvotech is aware, has knowledge, and/or is willfully blind to the fact that the formulation of the Alvotech aBLA Product directly infringes at least claims 1-5 and 16-30 of the '619 patent, either literally or under the doctrine of equivalents.

**ANSWER**:

Denied.

127.    Alvotech has knowledge of and is aware of the '619 patent, including due to AbbVie's disclosure of patents pursuant to 42 U.S.C. § 262(*l*)(3)(A) and to the filing of this Complaint.

**ANSWER**:

Admitted.

128.    AbbVie will suffer irreparable injury for which damages are an inadequate remedy unless Alvotech is enjoined from infringing the claims of the '619 patent.

**ANSWER**:

Denied.

129.    AbbVie seeks an injunction pursuant to at least 35 U.S.C. § 271(e)(4)(B) preventing Alvotech from the commercial manufacture, use, sale, offer for sale within and/or importation into the United States of the Alvotech aBLA Product.

**ANSWER**:

Defendant admits that Plaintiffs purport to seek an injunction pursuant to 35 U.S.C. § 271(e)(4)(B).  Defendant denies Plaintiffs are entitled to any relief pursuant to their claims including injunctive relief, in the least because one who seeks equity must do equity.  *See, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands.").

### PRAYER FOR RELIEF

Defendant denies that Plaintiffs are entitled to relief of any kind and requests that the Court deny all relief to Plaintiffs, including that requested by Plaintiffs in their Prayer for Relief.

WHEREFORE, Defendant prays that this Court grant the following relief:

A)  Dismiss Plaintiffs' claims in their entirety with prejudice;

B)  Enter judgment on Plaintiffs' claims in favor of Defendant and against Plaintiffs on all claims;

C)  Deny Plaintiffs any and all relief on their claims, including but not limited to the relief sought in Plaintiffs' Prayer For Relief a-e inclusive;

D)  Award to Defendant its costs and attorneys' fees of this action to be taxed against Plaintiffs;

E)  A declaration that this case is exceptional pursuant to 35 U.S.C. § 285, and an award of attorneys' fees and costs; and

F)  Award such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Defendant hereby demands a jury trial in this action for any issue so triable.

## DEFENSES

Without waiver, limitation, or prejudice to the denials set forth in its Answer, and without admitting any allegation of the complaint not expressly admitted herein, Defendant hereby asserts the following affirmative defenses:

## FIRST DEFENSE

### (Lack of Personal Jurisdiction)

130.    This Court does not have personal jurisdiction over Defendant Alvotech hf.

## SECOND DEFENSE

### (Failure to State a Claim)

131.    Plaintiffs' complaint fails to state a claim upon which relief can be granted.

**THIRD DEFENSE**

**(Non-Infringement of the Asserted Patents)**

132.     Plaintiffs' claims are barred in whole or in part because Alvotech hf. has not, and does not, directly infringe, induce infringement, or contribute to infringement of any valid and enforceable claim of the '081 patent, the '975 patent, the '973 patent, and the '619 patent, either literally or under the doctrine of equivalents, and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

**FOURTH DEFENSE**

**(Invalidity of the Asserted Patents)**

133.     Plaintiffs' claims are barred in whole or in part because each asserted claim of the '081 patent, the '975 patent, the '973 patent, and the '619 patent is invalid for failing to meet the requirements of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, 112 and/or pursuant to common law and/or equitable doctrines.

**FIFTH DEFENSE**

**(§ 271(e) Safe Harbor)**

134.     To the extent Plaintiffs claim that the manufacture and clinical use of AVT02 is an act of infringement, Defendant is exempt from liability pursuant to the safe harbor provision of 35 U.S.C. § 271(e).

**SIXTH DEFENSE**

**(No Equitable Relief)**

135.     Plaintiffs are not entitled to preliminary or permanent equitable relief.

## SEVENTH DEFENSE

### (Unclean Hands)

136.     Plaintiffs cannot obtain relief, including any injunctive relief, due to their unclean

hands, including as described in Defendant's counterclaim at Count I below.

## EIGHTH DEFENSE

### (Prohibition of Costs)

137.     Plaintiffs are barred by 35 U.S.C. § 288 from recovering any costs associated with

this action.

## NINTH DEFENSE

### (Prosecution History Estoppel)

138.     Plaintiffs are estopped from construing any valid claim of the '081 patent, the '975

patent, the '973 patent, and the '619 patent to be infringed or to have been infringed, either literally

or by application of the doctrine of equivalents, by any product made, used, imported, sold, and/or

offered for sale by Alvotech hf. in view of prior art and/or because of admissions, representations,

and/or statements made to the USPTO during prosecution of any application leading to the

issuance of the '081 patent, the '975 patent, the '973 patent, and the '619 patent or any related

patent because of disclosure or language in the specification of the '081 patent, the '975 patent,

the '973 patent, and the '619 patent, and/or because of limitations in the claims of the '081 patent,

the '975 patent, the '973 patent, and the '619 patent.

## TENTH DEFENSE

### (Inequitable Conduct)

139.     Plaintiffs are barred from asserting the claims of the '973 patent due to Plaintiffs' inequitable conduct during prosecution of the '973 patent, including as described in Defendant's counterclaims at Count IX, below.

## ELEVENTH DEFENSE

### (Patent Misuse)

140.     Plaintiffs are barred from asserting the claims of the '081 patent, the '975 patent, the '973 patent, and the '619 patent due to Plaintiffs' patent misuse, including as describing in Defendant's counterclaim at Count II, below.

## TWELFTH DEFENSE

### (No Exceptional Case)

141.     Defendant's actions related to this suit do not give rise to an exceptional case finding under 35 U.S.C. § 285.

## RESERVATION OF DEFENSES

Defendant reserves the right to assert any additional defenses or counterclaims, at law or equity that may exist, and that it reserves the right to seek leave to amend this Answer to add to, amend, withdraw, or modify these defenses as investigation continues and as discovery may require.

## COUNTERCLAIMS

Defendant Alvotech hf., through its undersigned counsel, counterclaims and alleges against AbbVie Inc. and AbbVie Biotechnology (collectively, "AbbVie") as follows:

## PARTIES

1.      Counterclaim Plaintiff Alvotech hf. is a corporation organized and existing under the laws of the Republic of Iceland, with its corporate headquarters at Saemundargata 15-19, 101 Reykjavik, Iceland.  Non-party Alvotech USA, Inc. ("Alvotech USA") is a corporation organized and existing under the laws of the Commonwealth of Virginia and a wholly-owned subsidiary of Alvotech hf., with its corporate headquarters and sole physical location in Arlington, Virginia.

2.      On information and belief, Counterclaim Defendant AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064.  AbbVie Inc. is the holder of BLA No. 125057 for Humira®.

3.      On information and belief, Counterclaim Defendant AbbVie Biotechnology Ltd. is a corporation organized and existing under the laws of Bermuda, with a place of business at Clarendon House, 2 Church Street, Hamilton HM11, Bermuda.  On information and belief, through intermediate organizations, AbbVie Inc. owns AbbVie Biotechnology Ltd.

4.      AbbVie Inc. markets Humira® in the United States, and has done so continuously since at least the beginning of 2003.  According to AbbVie Inc., the patents-in-suit relate to Humira®.  On information and belief, AbbVie Inc. and AbbVie Biotechnology Ltd. together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the patents-in-suit.

## JURISDICTION AND VENUE

5.      Alvotech hf.'s counterclaims arise under the patent laws of the United States, Title 35, United States Code.  This Court has subject matter jurisdiction over Alvotech hf.'s counterclaims under 28 U.S.C. §§ 1331 and 1338(a) and the Declaratory Judgment Act, 28  U.S.C.

§§ 2201 and 2202. A substantial controversy exists between Alvotech hf. and AbbVie, in which the parties have adverse legal interests of sufficient immediacy and reality to warrant the issue of a declaratory judgment from this Court.

6.      This Court has personal jurisdiction over AbbVie Inc. and AbbVie Biotechnology Ltd. because, among other reasons, they have subjected themselves to the jurisdiction of this Court at least by commencing the present action for patent infringement against Alvotech hf. in this District.

7.      Based solely on AbbVie's filing of the present action, venue is proper in this District under 28 U.S.C. § 1391.

**ACTS GIVING RISE TO ALVOTECH HF.'S COUNTERCLAIMS**

8.      Alvotech hf. brings counterclaims directed to unenforceability for unclean hands, patent misuse, noninfringement and invalidity.

9.      AbbVie designed a patent portfolio containing what it hoped to be an insurmountable number of patents (regardless of merit) protecting Humira®. AbbVie wields that portfolio against would-be competitors, including most recently Alvotech, with a goal of forcing capitulation and delaying competition by preventing adjudication of its uniquely large and still expanding patent portfolio and by manipulation of the patent dance and litigation procedure.

10.     The first three of Alvotech hf.'s counterclaims address AbbVie's misconduct towards Alvotech hf. in seeking to bury Alvotech hf. in ruinous litigation.

11.     Specifically, as detailed further below, AbbVie has no right to enforce its patents, and no claim to equitable relief in relation to Alvotech hf. because, in its longstanding effort to improperly maintain its monopoly on Humira®, it has acted inequitably towards Alvotech hf.

through (1) its improper behavior in the patent dance; (2) its misuse of Alvotech hf. confidential information; and (3) its improper assertion of 58 patents from its "IP minefield."

### A. AVT02—the First Biosimilar to 100 mg/mL Humira®

12. The active ingredient in Alvotech hf.'s AVT02 product is adalimumab. Adalimumab belongs to a category of drugs known as biologics. It is a protein manufactured in living cells rather than by chemical synthesis. Adalimumab is a fully human, high-affinity, and neutralizing therapeutic antibody to human TNFα, a protein made by the human body as part of the body's immune response. Many diseases are known to be caused by high levels of TNFα and are treated with anti-TNFα biologics.

13. AbbVie's Humira® is an injectable formulation of adalimumab. The FDA first approved Humira® in 2002 as a treatment for rheumatoid arthritis, a chronic inflammatory disorder that affects the lining of the joints and is caused by high levels of TNFα. Patients with rheumatoid arthritis can suffer from painful swelling that might eventually result in bone erosion and joint deformity, as well as damage to other parts of the body. Humira® is now FDA-approved for other similarly painful and/or disruptive chronic disorders, all of which, like rheumatoid arthritis, are known to be TNFα-related disorders.

14. As first launched by AbbVie's predecessor Abbott Laboratories in 2003, Humira® was a 50 mg/ml formulation that contained, among other things, a phosphate-citrate buffer. In 2018, facing potential competition for the first time, AbbVie began marketing a 100 mg/ml "citrate-free" (as AbbVie calls it) formulation of Humira® in the U.S. In this "citrate-free" formulation, AbbVie eliminated the buffer from the 50 mg/ml formulation. AbbVie's advertising materials tout that the 100 mg/ml "citrate-free" formulation causes less pain upon injection than the 50 mg/ml formulation.

15.     Counterclaim Plaintiff Alvotech hf. has developed a biosimilar to the 100 mg/ml formulation of Humira®, known as AVT02.  On information and belief, if the FDA approves AVT02, it will be the first biosimilar to the citrate-free, 100 mg/ml formulation of Humira® approved in the United States.  Alvotech is committed to bringing its 100 mg/ml, bufferless formulation to market upon FDA approval in order to make the lower-cost alternative available to patients as quickly as possible.

16.     The Alvotech family of companies developed AVT02 through years of rigorous testing and development efforts, starting in 2013.  After selecting adalimumab for development, the Alvotech companies and their contractors generated expression vectors, genetically modified CHO cells to produce adalimumab, and analyzed thousands of the resulting CHO cell minipools for expression of adalimumab before selecting a unique AVT02 CHO cell clone for adalimumab production.  Over the course of several years, scientists at multiple sites in Iceland and Europe developed upstream and downstream manufacturing processes to maximize production output and obtain high quality product.  These scientists tested and adjusted parameters and steps, including medium and feeds, feed timing, temperature, culturing time, chromatography resins, loading density and wash steps, and more.  The scientists completed the first at-scale GMP drug substance batch of AVT02 by early 2018.

17.     In addition, Alvotech's scientists made and tested multiple formulations before settling on the AVT02 formulation.  Alvotech's formulation uses different excipients than AbbVie's "citrate-free" formulation.

18.     After developing its 100 mg/ml formulation of adalimumab, Alvotech sponsored multiple multicenter, double-blind clinical trials to compare the efficacy, immunogenicity, safety, pharmacokinetics, and tolerability of AVT02 to Humira® in patients.  To date, hundreds of patients

have enrolled in Alvotech's clinical trials of AVT02. Alvotech's clinical trials established that there is no clinically meaningful difference between AVT02 and Humira® in the safety, tolerability, and immunogenicity outcome measures. Alvotech's Phase III comparative clinical trial for AVT02 met its primary objective by demonstrating equivalent efficacy to Humira® in the measured parameters. Alvotech's clinical switching study (AVT02-GL-302) is ongoing.

19.     Upon conclusion of the initial clinical trials, Alvotech prepared the voluminous documentation required by the FDA for a BLA for AVT02. Alvotech USA filed its application on September 4, 2020, the FDA accepted Alvotech USA's AVT02 BLA on November 3, 2020 and assigned number 761205 to Alvotech USA's AVT02 BLA.

### B.     AbbVie's Extensive Misconduct Directed at Alvotech

20.     Following the submission of the BLA and Alvotech USA's required notice to AbbVie, AbbVie targeted Alvotech with acts of misconduct specific to Alvotech in order to gain a litigation advantage.

### 1.     AbbVie's Misconduct During the Patent Dance

21.     On November 5, 2020, Alvotech USA provided AbbVie Inc. with the AVT02 BLA and voluminous other information required under 42 U.S.C. § 262(*l*)(2)(A), initiating a series of statutorily-required disclosures (colloquially known as the "patent dance") between Alvotech USA and AbbVie Inc. The AVT02 BLA and other information provided by Alvotech USA to AbbVie Inc. described in detail the AVT02 drug substance and drug product, the drug delivery device for AVT02, and methods of making, purifying, and testing AVT02.

22.     As part of the patent dance, on January 4, 2021, under 42 U.S.C. § 262(*l*)(3)(A), AbbVie Inc. identified 63 patents (AbbVie's "3(A) List"), including the patents-in-suit, which it alleged could reasonably be asserted against Alvotech USA if Alvotech USA were to manufacture, use, offer for sale, sell in the United States, or import into the United States AVT02 without a

license from AbbVie.  Despite AVT02 being a 100 mg/ml formulation of adalimumab, AbbVie Inc. included in its 3(A) List one entire patent and several other patents with claims directed to 50 mg/ml formulations that could not reasonably be asserted against AVT02.  AbbVie also failed to identify the patents on its 3(A) List that AbbVie would be prepared to license to Alvotech USA, as required by § 262(*l*)(3)(A); indeed, AbbVie's letter enclosing its 3(A) List was silent on this point.

23.     On January 14, 2021, under 42 U.S.C. § 262(*l*)(3)(B), Alvotech USA provided AbbVie Inc. over 6000 pages of detailed statements that describe, on a claim by claim basis for each of the 63 patents, the factual and legal basis why each claim of the 63 asserted patents is invalid, unenforceable, and/or will not be infringed by the commercial marketing of AVT02 (Alvotech USA's "3(B) Statement").  Alvotech USA also cited and produced over 270 pieces of prior art, demonstrating that AbbVie's patents are invalid as anticipated and/or obvious.

24.     In response, AbbVie Inc. purported to provide to Alvotech USA a statement of infringement and validity under 42 U.S.C. § 262(*l*)(3)(C) on 62 of their 63 listed patents (AbbVie Inc.'s "3(C) Statement").  In this statement, AbbVie Inc. failed to satisfy its statutory obligation under § 262(*l*)(3)(C).  Specifically, on information and belief, AbbVie unilaterally chose to ignore Alvotech USA's contentions for many of the claims in the 62 patents—while expressly reserving the right to assert all claims to respond to Alvotech USA's statement concerning validity and enforceability.

25.     Additionally, during the dance, AbbVie conceded that there is no infringement of four AbbVie patents: U.S. Patents Nos. 8,883,156; 8,895,009; 8,906,372; and 8,916,153. Yet despite having the AVT02 BLA, which shows that AVT02 does not infringe those claims and thus,

by AbbVie's own concession, AVT02 cannot infringe those four patents—AbbVie Inc. kept all four patents in the dance and asserted them against Alvotech hf. in the second phase litigation.

26.     Notwithstanding AbbVie Inc.'s deficiencies, starting no later than March 17, 2021, Alvotech USA engaged in good faith negotiations under 42 U.S.C. § 262(*l*)(4)(A) to identify the patents on the 3(A) List that should be the subject of "the immediate patent infringement action" authorized under 42 U.S.C. § 262(*l*)(6).  AbbVie did not engage in good faith negotiations.

27.     After first proposing a mutual exchange, which AbbVie Inc. rejected without any counter-suggestion, Alvotech USA led off the negotiations by providing AbbVie Inc. with a list of the four patents-in-suit.  Alvotech USA reasonably anticipated that AbbVie Inc. would respond with its own list of patents that should be litigated if AbbVie did not agree with Alvotech USA's list, and then the parties would continue to negotiate.  Instead, on March 29, 2021, the last day possible under the statute, AbbVie Inc. provided no substantive response to Alvotech USA's proposal, instead taking the position that Alvotech USA "need[ed] to pick all [62] patents" if it wanted to bring its product to market and that "litigating only those four patents alone will not in any way 'resolve' the issues of patent infringement with respect to Alvotech's product."  AbbVie Inc. thus refused to limit its asserted patents in any meaningful way during the BPCIA patent dance, contrary to the underlying purpose of the statute.  Consistent with its long-held strategy of attempting to bury its competitors, AbbVie Inc. raised the specter of ruinous litigation if Alvotech USA sought to bring its biosimilar product to market.  Notably, in correspondence between the parties, AbbVie Inc. stated it was unwilling to license even a single one of the 63 patents it had originally asserted in the patent dance (and many of which, if not all, it has previously licensed to others)—well after such a licensing statement was statutorily required under § 262(*l*)(3)(A).

### 2. AbbVie's Misusing Alvotech's Confidential Information During Prosecution of New Patents

28.     Under the BPCIA, the confidential information exchanged may be used "for the sole and exclusive purpose of determining . . . whether a claim of patent infringement could reasonably be asserted." 42 U.S.C. § 262(*l*)(1).  That section specifically prohibits AbbVie and its attorneys from sharing the information with anyone for whom Alvotech USA has not provided "prior written consent," including even "other outside counsel retained by the reference product sponsor."

29.     Because of the highly sensitive nature of the confidential information Alvotech USA was disclosing, Alvotech USA told AbbVie that it would consent to the information being shared beyond AbbVie's litigation counsel only upon "advanced notice of the names" of those with whom it would be shared and only upon AbbVie's confirmation that those with whom it was shared would "not engage, formally or informally, in patent prosecution."  Alvotech USA particularly highlighted that the information provided by Alvotech USA during the patent dance "should not be given to AbbVie's prosecution attorneys."

30.     Notwithstanding the prohibition on Alvotech's confidential information being shared with AbbVie's prosecution attorneys or used in prosecution, it appears, on information and belief, that AbbVie has done exactly that.  This can be seen, for example, in AbbVie's prosecution of two new applications in the same family as the '081 and '619 patents-in-suit, purportedly covering adalimumab formulations.  Prior to Alvotech USA's providing AbbVie with Alvotech USA's confidential BLA, AbbVie had not meaningfully pursued prosecution of that patent family for more than 5 years—since the issuance of the '619 patent in 2015.  Rather, from 2015 until the end of 2020, AbbVie routinely abandoned each successive application it filed in that family.  Then, on December 29, 2020, mere weeks after Alvotech USA provided AbbVie Inc. with its confidential

BLA, AbbVie's prosecuting attorneys at Jones Day filed two new patent applications in the '081/'619 patent family, seeking expedited prosecution of both: U.S. Application Nos. 17/137,201 (the " '201 application") and 17/137,246. The PTO issued Notices of Allowance for both patents in August of 2021.

31.     Notably, under the BPCIA and Alvotech USA's instructions to AbbVie Inc., AbbVie's patent prosecutors at Jones Day were prohibited from seeing Alvotech USA's confidential BLA. Yet the claims in the new applications are narrower than the claims prosecuted in earlier, related applications, and on information and belief, were drafted to target the confidential AVT02 formulation disclosed in that BLA.

32.     The '201 application's narrow focus is noteworthy when contrasted with the breadth of prior claims in the '081/'619 family. For example, here are exemplary independent claims from the asserted '081 patent (claim 1) and '619 patent (claims 16):

> **1.** An aqueous formulation comprising an antibody, or antigen-binding fragment thereof, at a concentration of at least about 20 mg/mL and water, wherein the formulation has a conductivity of less than about 2.5 mS/cm and the antibody, or antigen-binding fragment thereof, has a molecular weight ($M_w$) greater than about 47 kDa.

> **16.** An aqueous pharmaceutical formulation comprising:
> (a) an anti-tumor necrosis factor alpha antibody comprising a light chain variable region (LCVR) having a CDR3 domain comprising the amino acid sequence of SEQ ID NO:3, a CDR2 domain comprising the amino acid sequence of SEQ ID NO:5, and a CDR1 domain comprising the amino acid sequence of SEQ ID NO: 7, and a heavy chain variable region (HCVR) having a CDR3 domain comprising the amino acid sequence of SEQ ID NO:4, a CDR2 domain comprising the amino acid sequence of SEQ ID NO: 6, and a CDR1 domain comprising the amino acid sequence of SEQ ID NO:8, wherein the concentration of the antibody is 50 to 200 mg/ml; and
> (b) water;
> wherein the formulation does not comprise a buffering system.

Notably, AbbVie did not purport to make these narrowing changes to avoid any prior art references.

33.     In addition to the similarity between the confidential AVT02 formulation and AbbVie's new claims, the specific arguments presented by AbbVie's prosecuting attorneys demonstrate that prosecution of the new claims was being guided by Alvotech's confidential BPCIA disclosures. AbbVie's treatment of a key piece of prior art—the Gokarn PCT application ("Gokarn PCT")—is particularly significant. On January 14, 2021, Alvotech provided AbbVie with its confidential 3(B) Statement, in which Alvotech relied on Gokarn PCT as a key piece of invalidating prior art for the '081 and '619 patents. Thereafter, on March 18, 2021, the examiner issued a non-final rejection on the '201 application. Although that non-final rejection did not rely on Gokarn PCT, on March 31, 2021, AbbVie injected Gokarn PCT into the prosecution of the '201 Application, stating that "although currently not grounds of rejection in the present Office Action, Applicant would like to pre-emptively point out that the present claims are also not anticipated by Gokarn PCT." Prior to making this preemptive argument, AbbVie had never before sought substantive examination of Gokarn PCT during prosecution of the patent family, and Gokarn PCT had never been the basis for rejection of any claim in that family.

34.     On information and belief, AbbVie's preemptive effort to address Gokarn PCT was the result of AbbVie's prosecuting attorneys learning of Alvotech USA's reliance on Gokarn PCT in its confidential 3(B) Statement. On information and belief, by raising Gokarn PCT preemptively with the patent office, AbbVie sought to gain a litigation advantage. On information and belief, AbbVie never informed the patent office that there was pending litigation involving the family of patents that includes the '201 application. By raising Gokarn PCT preemptively with the patent office, AbbVie was able to use a non-adversarial proceeding to obtain the PTO's determination

that the '201 application's claims were patentable over Gokarn PCT. Thus, when in the future, Alvotech presents invalidity arguments on those claims in an adversarial litigation, AbbVie can tell the judge or jury that these patents are "battle-tested" as being patentable over Gokarn PCT. AbbVie has identified the patent issuing from the '201 application as one it asserts against Alvotech hf. as soon as the patent issues.

35.     Another example of AbbVie's improper use of Alvotech's confidential information is illustrated by AbbVie's actions during prosecution of the patent application that eventually issued as U.S. Patent No. 11,083,792 (the "'792 patent"). The application leading to the '792 patent was filed on November 8, 2018. Thereafter, on June 3, 2021, AbbVie amended the claims in the pending application to include a limitation that the claimed composition has "no detectable level" of fluorescent activity. On information and belief, this claim language was added in view of Alvotech's confidential information. The only other time AbbVie had used that claim language was in a single claim in an earlier patent limited to a composition of "50 mg/ml of adalimumab." The new '792 patent contains no such limitation. AbbVie has identified this patent as one it asserts against Alvotech.

### 3.     AbbVie's Assertion of Its Entire "Minefield of IP"

36.     AbbVie has sought to overwhelm Alvotech with litigation through its assertion of all of its patents from its 3(C) Statement.

37.     Instead of engaging with Alvotech during the patent dance to narrow the list of patents, AbbVie stated that Alvotech USA "need[ed] to pick all [62] patents" if it wanted to bring its product to market. Since serving that initial 3(C) list, AbbVie has identified three more patents it intends to assert against Alvotech.

38.     AbbVie brought this first patent suit in the above captioned matter on the four patents Alvotech USA identified in the patent dance negotiation phase. *See, e.g.*, Compl., ¶ 15.

AbbVie had the chance to identify and negotiation with Alvotech USA regarding any patents AbbVie felt should be part of this first suit; but AbbVie did not. Instead, it brought this suit on those four patents, while continuing to maintain that Alvotech USA must face "the remaining patents in a second phase" in order to "adjudicate the rest of AbbVie's substantial patent rights relating to HUMIRA®." *See id.* at ¶¶ 15-16.

39. On May 11, 2021, Alvotech USA provided AbbVie Inc. with its notice of commercial marketing for AVT02, opening the door for Alvotech USA to launch AVT02 180 days later. In response, on May 28, 2021, AbbVie brought a second infringement action against Alvotech hf., this time asserting the remaining 58 patents on its 3(C) List. AbbVie's assertion of 58 patents in that second litigation was improper for numerous reasons.

40. First, the 58 patents asserted in the second litigation includes the '156, '009, '372, and '153 patents. For each of those patents, AbbVie conceded during the patent dance, based on Alvotech's confidential information, that "there is no infringement." Thus, AbbVie lacks any good faith basis to assert those four patents against Alvotech with respect to AVT02.

41. Second, although asserting all the patents, AbbVie never intended to pursue them all. Under 42 U.S.C. § 262(*l*)(8)(A)-(B), the purposes of a second litigation following the notice of commercial marketing is to "seek a preliminary injunction prohibiting the subsection (k) applicant from engaging in the commercial manufacture or sale." 42 U.S.C. § 262(*l*)(8)(A)-(B). Yet AbbVie admitted in a letter to this Court that it only intended to seek a preliminary injunction on *some* of the 58 patents, stating that "several" of those patents would be included in a preliminary injunction motion. Despite requests from Alvotech, AbbVie did not identify which "several" of the 58 patent it intended to be the subject of a preliminary injunction motion and never filed a preliminary injunction motion. It was not until the Court ordered a narrowing for trial that AbbVie

identified a narrower list of patents.  Thus, from at least July 2, 2021 when AbbVie first raised the issue of a preliminary injunction in a draft status report, to September 2, 2021, when the Court stated it would hold a trial and no preliminary injunction proceeding, Alvotech was forced to prepare to defend a preliminary injunction motion on all 58 patents, rather than just the "several" that AbbVie actually intended to pursue all along.

### C.      AbbVie's Long History of Misconduct Aimed at Extending its Humira® Monopoly

42.     AbbVie's behavior towards Alvotech is consistent with its long practice of bury and delay.  The reason is clear.  Between 2003 and 2016, when the twelve patents arising from BASF AG's 1995 discovery expired, AbbVie reportedly sold nearly $100 billion worth of Humira® worldwide.  To put this in perspective, a drug with annual sales of $1 billion is considered a blockbuster in the pharmaceutical industry.  In just the last four years, since its monopoly should have run its course, AbbVie has reported selling over $75 billion worth of Humira® and is forecasted to make an additional nearly $40 billion through 2022.

43.     AbbVie protects its monopoly through the acquisition and threatened enforcement of an outrageous number of patents of dubious validity—in excess of 100.  AbbVie did not, however, invent anything.

44.     Adalimumab was discovered more than twenty years ago.  In 1996, a German company, BASF AG, filed a patent application disclosing adalimumab and methods of using it to treat TNFα-related autoimmune diseases.  In 2001, after BASF had undertaken years of further development work, AbbVie's predecessor, Abbott Laboratories, purchased the rights to the drug, the patents, and all of BASF's additional work for $6.9 billion.

45.     Since then, AbbVie has sought and obtained over 100 additional patents related to adalimumab.  The Chief Executive Officer of AbbVie has referred to this excessive number of patents as an "absolute minefield of IP."  AbbVie now asserts that minefield of IP against Alvotech.

46.     One example of the lack of innovation in AbbVie's minefield can be seen in the numerous patents AbbVie has obtained on methods of treating various TNFα disorders.  In the last fifteen years, AbbVie has obtained more than two dozen such patents, all of which post-date the original launch of Humira®.  Yet previously, and in reliance on the 1996 disclosure for AbbVie's original adalimumab patents, AbbVie and its predecessors (BASF and Abbott) had already sought and obtained claims covering methods of treating *any* TNFα disorder, and also specifically claimed the majority of disorders for which AbbVie later sought and obtained additional patents.  For example, in reliance on the 1996 disclosure, AbbVie obtained claims on any "method for inhibiting human TNFα activity in a human subject suffering from a disorder in which TNFα activity is detrimental" or "treating a subject suffering from a disorder in which TNFα activity is detrimental."  (*See, e.g.*, U.S. Patent No. 6,509,015 at claims 1, 36).  In addition to those broad independent claims covering treatment of any TNFα disorder, AbbVie also obtained claims arising from the original 1996 application on methods of treating "rheumatoid arthritis," "rheumatoid spondylitis," "Crohn's disease," "ulcerative colitis," "autoimmune uveitis," "inflammatory bowel disorder," "idiopathic inflammatory bowel disease," "an intestinal disorder," "inflammatory bone disorders," (which includes rheumatoid arthritis and ankylosing spondylitis), and "an autoimmune disease."  (*See, e.g.*, *id.*; *see also* U.S. Patent Nos. 7,588,761; 8,753,633; 7,223,394; 8,216,714; and U.S. Patent No. 8,372,400).

47.     Despite having successfully persuaded the PTO that the original 1996 application supported claims covering methods of using adalimumab to treat any TNFα disorder—and

specifically, methods of treating "rheumatoid arthritis," "rheumatoid spondylitis," "Crohn's disease," "ulcerative colitis," "autoimmune uveitis," "inflammatory bowel disorder," "idiopathic inflammatory bowel disease," "an intestinal disorder," "inflammatory bone disorders," and "an autoimmune disease"—AbbVie has since obtained more than two dozen unrelated patents claiming methods of treating various TNFα disorders with adalimumab. These additional patents, including U.S. Patent Nos. 8,926,975 and 8,961,973, claim later priority dates and thus, extend AbbVie's monopoly beyond the 2016 expiration date of the original adalimumab patents.

48. Any competitor, like Alvotech, that desires to bring a biosimilar version of Humira® to market is threatened with at least 60 patents from AbbVie's "minefield," and prior to Alvotech, each has settled without the merits of any single patent being addressed in court. This scheme has secured AbbVie years of additional time for its monopoly. On information and belief, the size of AbbVie's "minefield" motivates competitors to settle quickly. AbbVie uses those settlements to intimidate the next competitor and bolster its portfolio. For example, AbbVie stated to Alvotech and the Court that there were ten would-be competitors that settled, "each of whom expressly acknowledged the validity of AbbVie's patents and sought and negotiated for licenses to enter the U.S. market starting in 2023." (*See* Dkt. No. 35, ¶ 2, AbbVie's Motion to Reinstate the July 15, 2021 Initial Status Conference or Set One As Soon As Reasonably Possible.) On information and belief, those companies settled not because they conceded the validity of the patents, but because they were intimidated by the size of the portfolio. AbbVie's representations otherwise are another example of litigation misconduct meant only to intimidate.

49. And on information and belief, how AbbVie got that minefield motivates AbbVie to settle quickly. On information and belief, AbbVie recognizes the dubious validity of its patents and avoids any meaningful adjudication of them. For example, AbbVie settled with Boehringer

Ingleheim shortly after AbbVie was required to produce documents that AbbVie had sought to preclude, thereby preventing resolution of related to Boehringer's patent defense of unclean hands.

50.     In short, AbbVie has managed to subvert the very process designed to prevent its wrongdoing "by means of the overpowering threat of disastrous litigation." *See Automatic Radio Mfg. v. Hazeltine Research*, 339 U.S. 827, 834 (1950).

51.     Finally, even the settlements contributed to AbbVie's overall strategy. Each of AbbVie's settlements has been with biosimilar manufacturers who were seeking approval of 50 mg/ml formulations. As AbbVie settled with those companies, it was busy shifting the market to 100 mg/ml. That market switch is another example of AbbVie's misconduct and why AbbVie now has targeted Alvotech, the only BLA applicant with a 100 mg/ml formulation.

52.     Specifically, AbbVie had tested the less painful 100 mg/ml formulation by 2010 and the FDA approved it in 2015. Notwithstanding that formulation's touted benefits to reduce pain, AbbVie waited nearly three years after FDA approval to bring it to market. During that time, biosimilar companies developed 50 mg/ml biosimilar formulations because the 50 mg/ml formulation was the only version on the market. On information and belief, AbbVie waited to launch the 100 mg/ml product until those programs were well underway, in an effort to render obsolete these early competitors' development efforts. AbbVie thus withheld from the market its purportedly less painful formulation until it was strategically and financially favorable to do so in order to extend its monopoly. It now asserts patents purportedly covering those formulations against Alvotech.

## THE PATENTS-IN-SUIT

53.     U.S. Patent No. 8,420,081 ("the '081 patent"), titled "Antibody Formulations and Methods of Making Same," issued on April 16, 2013. On information and belief, the '081 patent

is assigned to AbbVie Biotechnology Ltd. On information and belief, AbbVie Inc. and AbbVie Biotechnology Ltd. together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '081 patent.

54. U.S. Patent No. 9,085,619 ("the '619 patent"), titled "Anti-TNF Antibody Formulations," issued on July 21, 2015. On information and belief, the '619 patent is assigned to AbbVie Biotechnology Ltd. On information and belief, AbbVie Inc. and AbbVie Biotechnology Ltd. together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '619 patent.

55. U.S. Patent No. 8,926,975 ("the '975 patent"), titled "Method of Treating Ankylosing Spondylitis," issued on January 6, 2015. On information and belief, the '975 patent is assigned to AbbVie Biotechnology Ltd. On information and belief, AbbVie Inc. and AbbVie Biotechnology Ltd. together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '975 patent.

56. U.S. Patent No. 8,961,973 ("the '973 patent"), titled "Multiple-Variable Dose Regimen for Treating TNFα-Related Disorders," issued on February 24, 2015. On information and belief, the '973 patent is assigned to AbbVie Biotechnology Ltd. On information and belief, AbbVie Inc. and AbbVie Biotechnology Ltd. together hold the exclusive right to initiate, control, and defend any patent infringement litigation involving the '973 patent.

## COUNT I

### (Unenforceability Due to Unclean Hands)

57. Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

58. Each of the patents-in-suit is unenforceable due to AbbVie's unclean hands. The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness

or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945).  Where a patentee's unclean hands have impacted the public, the doctrine "assumes even wider and more significant proportions," because it "not only prevents a wrongdoer from enjoying the fruits of his transgressions but averts an injury to the public." *Id*. at 815.  Additionally, "[t]he far-reaching social and economic consequences of a patent . . . gives the public a paramount interest in seeing that . . . such monopolies are kept within their legitimate scope." *Id.* at 816.  Proof of fraud is unnecessary; unclean hands may be found where a patent holder's misconduct has "reduced a patentee's risk" or otherwise "enhance[d] the claimant's position regarding legal rights that are important to [patent] litigation." *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1244 (Fed. Cir. 2018).

59.     AbbVie has engaged in a pattern of misconduct designed to build and shield its "patent minefield" from meaningful litigation, thus reducing the risk that those patents would undergo the legal scrutiny necessary to ensure that AbbVie's "monopol[y is] kept within their legitimate scope." *See Precision Instrument*, 324 U.S. at 815.  This misconduct has included, at least, artificially inflating the size of its patent portfolio, thus giving AbbVie a substantially larger "minefield of IP" with which to intimidate its competitors into staying off the market. With respect to Alvotech specifically, it has included extensive efforts to overwhelm Alvotech with the threat of ruinous litigation, including failing to participate in the patent dance in good faith; asserting patents against Alvotech for which it has conceded there cannot be infringement; and asserting more than 60 total patents against Alvotech, including patents it has no intention of actually pursuing in litigation. This conduct aimed at overwhelming Alvotech has "reduced [the] patentee's

risk" or otherwise "enhance[d] the claimant's position regarding legal rights that are important to [patent] litigation." *Gilead*, 888 F.3d at 1244.

60.     AbbVie's misconduct also included using Alvotech's confidential information disclosed in the BPCIA patent dance to guide its patent prosecution efforts. Although a patentee may sometimes properly amend claims to cover a competitor's product, doing so constitutes unclean hands if the prosecuting attorney had improper access to the competitor's confidential information and that information "played a significant role in [the prosecuting agent's] actual process of decision-making that led [the agent] to file claims focusing on [the competitor's product]." *Gilead*, 888 F.3d at 1243-44. Here, on information and belief, AbbVie's prosecuting attorneys at Jones Day were improperly given confidential information about Alvotech's AVT02 BLA and Alvotech's 3(B) Statement, which information played a significant role in the decision-making process that led the prosecuting attorneys' to draft claims targeted at AVT02.

61.     Additionally, AbbVie engaged in inequitable conduct as it relates to the '973 patent, as described below, and such inequitable conduct is also relevant to AbbVie's unclean hands.

62.     The application of unclean hands here is needed to not only prevent AbbVie from enjoying the fruits of its transgressions, but also to avert an injury to the public. *See Precision Instrument*, 324 U.S. at 815 (holding that where a patentee's unclean hands have impacted the public, the doctrine "assumes even wider and more significant proportions," because it "not only prevents a wrongdoer from enjoying the fruits of his transgressions but averts an injury to the public"). The public has spent more money on Humira® than any drug in U.S. history, leaving little doubt as to the far-reaching socioeconomic consequences of AbbVie's adalimumab monopoly. If AbbVie is not stopped, the public will continue to pay unnecessarily high prices

beyond 2023 and as far as 2037—when the last of AbbVie's current patent portfolio (it continues to try and get more) is set to expire—at the cost of $20 billion per year or more.

## COUNT II

### (Unenforceability Due to Patent Misuse)

63.     Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.   In particular, paragraphs 58 to 62 of Count I (Unclean Hands) are equally applicable to AbbVie's patent misuse.

64.     Each of the patents-in-suit is unenforceable under the doctrine of patent misuse. Patent misuse occurs when a patentee "has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect."  *See, e.g.*, *Virginia Panel Corp.*, 133 F.3d 860, 869 (Fed. Cir. 1997).  Many kinds of conduct may fall within the scope of patent misuse.  One example is where a patentee brings a lawsuit in "bad faith" and with an "improper purpose in bringing the suit."  *Glaverbel Societe Anonyme v. Northlake Mktg & Supply Inc.*, 45 F.3d 1550, 1558 (Fed. Cir. 1995).  "A purpose is improper if its goal is not to win a favorable judgment, but to harass a competitor and deter others from competition, by engaging the litigation process itself, regardless of outcome."  Additionally, although the "mere accumulation of patents, no matter how many, is not ***in and of itself*** illegal," use of a large portfolio to intimidate competitors "by means of the overpowering threat of disastrous litigation," may be patent misuse.  *Automatic Radio Mfg. v. Hazeltine Research*, 339 U.S. 827, 834 (1950) (emphasis added).

65.     The facts described above show that AbbVie's scheme is to "engage the litigation process itself"—including the enormous expense and uncertainty of that process—to "deter others from competition," and to avoid legal scrutiny of its patents.  AbbVie has used the size of its portfolio to intimidate Alvotech and prior competitors "by means of the overpowering threat of

disastrous litigation." AbbVie's apparent purpose has not been to win a favorable judgment, but rather to avoid any judgment at all by coercing challengers to abandon litigation. With respect to Alvotech, AbbVie has pursued those efforts by, among other things, failing to participate in the patent dance in good faith; asserting patents against Alvotech for which it has conceded there cannot be infringement; and asserting more than 60 total patents against Alvotech, including patents it has no intention of actually pursuing in litigation. AbbVie has engaged the litigation process itself—including the time and expense of that process—to harass Alvotech and others in an effort to deter them from competition. To date, AbbVie has settled with every prior competitor, avoiding court scrutiny of its Humira®-related patent portfolio. Thus, AbbVie has impermissibly broadened the physical and temporal scope of its patents, with an anticompetitive effect, and seeks to do so again with Alvotech.

## COUNT III

### (Declaratory Judgment of Non-infringement of U.S. Patent No. 8,420,081)

66. Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

67. Alvotech hf. has not infringed and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '081 patent under 35 U.S.C. § 271. On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262($l$)(3)(B) describing, on a claim by claim basis, the factual and legal bases for Alvotech's opinion that it will not infringe the '081 patent. Alvotech USA's detailed statement is within AbbVie's possession and is incorporated by reference herein. In addition, Alvotech cannot be liable for any infringement of the '081 patent because it is invalid and unenforceable.

71

68.     On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that Alvotech hf. will infringe the '081 patent.  AbbVie filed a suit for infringement of the '081 patent against Alvotech hf. on April 27, 2021 in this Court.

69.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie at least as to the infringement of the '081 patent.

70.     Alvotech hf. is entitled to a judicial declaration that the making, use, offer for sale, sale, or importation into the United States of Alvotech hf.'s biosimilar product does not and will not infringe any valid and enforceable claim of the '081 patent under 35 U.S.C. § 271.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT IV

### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,420,081)

71.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

72.     The claims of the '081 patent are invalid for failing to meet the requirements of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, 112 and/or pursuant to common law and/or equitable doctrines.  On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases of Alvotech USA's opinion that the claims of the '081 patent are invalid.  Among other reasons, the claims of the '081 patent are invalid under 35 U.S.C. §§ 102 and/or 103 in light of prior art that published or was otherwise

available to the public before the earliest possible priority date of the '081 patent, including, for example, the prior art Alvotech USA produced or otherwise identified to AbbVie Inc. with Alvotech USA's detailed statement. Alvotech USA's detailed statement addressing invalidity of the '081 patent is within AbbVie's possession and is incorporated by reference herein.

73.     On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. responded to Alvotech USA's detailed statement addressing validity of the '081 patent and purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that the '081 patent is not invalid. AbbVie filed a suit for infringement of the '081 patent against Alvotech hf. on April 27, 2021 in this Court.

74.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to whether the claims of the '081 patent are invalid for failure to comply with the requirements of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, 112, and/or pursuant to common law and/or equitable doctrines.

75.     Alvotech hf. is entitled to a judicial declaration that all claims of the '081 patent are invalid. Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT V

### (Declaratory Judgment of Non-infringement of U.S. Patent No. 8,926,975)

76.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

77.     Alvotech hf. has not infringed and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '975 patent under 35

73

U.S.C. § 271.  On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases for Alvotech opinion that it will not infringe the '975 patent.  Alvotech USA's detailed statement is within AbbVie's possession and is incorporated by reference herein.  In addition, Alvotech hf. cannot be liable for any infringement of the '975 patent because it is invalid and unenforceable.

78.     On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that Alvotech hf. will infringe the '975 patent.  AbbVie filed a suit for infringement of the '975 patent against Alvotech hf. on April 27, 2021 in this Court.

79.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to the infringement of the '975 patent.

80.     Alvotech hf. is entitled to a judicial declaration that the making, use, offer for sale, sale, or importation into the United States of Alvotech hf.'s biosimilar product does not and will not infringe any valid and enforceable claim of the '975 patent under 35 U.S.C. § 271.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT VI

### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,926,975)

81.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

82.     The claims of the '975 patent are invalid for failing to meet the requirements of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103,

112 and/or pursuant to common law and/or equitable doctrines. On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases of Alvotech USA's opinion that the claims of the '975 patent are invalid. Among other reasons, the claims of the '975 patent are invalid under 35 U.S.C. §§ 102 and/or 103 in light of prior art that published or was otherwise available to the public before the earliest possible priority date of the '975 patent, including, for example, the prior art Alvotech USA produced or otherwise identified to AbbVie Inc. with Alvotech USA's detailed statement. Alvotech USA's detailed statement addressing invalidity of the '975 patent is within AbbVie's possession and is incorporated by reference herein.

83. On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. responded to Alvotech USA's detailed statement addressing validity of the '975 patent and purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that the '975 patent is not invalid. AbbVie filed a suit for infringement of the '975 patent against Alvotech hf. on April 27, 2021 in this Court.

84. As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to whether the claims of the '975 patent are invalid for failure to comply with the requirements of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, 112, and/or pursuant to common law and/or equitable doctrines.

85. Alvotech hf. is entitled to a judicial declaration that all claims of the '975 patent are invalid. Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT VII

### (Declaratory Judgment of Non-infringement of U.S. Patent No. 8,961,973)

86.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

87.     Alvotech hf. has not infringed and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '973 patent under 35 U.S.C. § 271.  On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases for Alvotech opinion that it will not infringe the '973 patent.  Alvotech USA's detailed statement is within AbbVie's possession and is incorporated by reference herein.  In addition, Alvotech hf. cannot be liable for any infringement of the '973 patent because it is invalid and unenforceable.

88.     On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that Alvotech hf. will infringe the '973 patent.  AbbVie filed a suit for infringement of the '973 patent against Alvotech hf. on April 27, 2021 in this Court.

89.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to the infringement of the '973 patent.

90.     Alvotech hf. is entitled to a judicial declaration that the making, use, offer for sale, sale, or importation into the United States of Alvotech hf.'s biosimilar product does not and will not infringe any valid and enforceable claim of the '973 patent under 35 U.S.C. § 271.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT VIII

### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,961,973)

91.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

92.     The claims of the '973 patent are invalid for failing to meet the requirements of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, 112 and/or pursuant to common law and/or equitable doctrines.  On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases of Alvotech USA's opinion that the claims of the '973 patent are invalid.  Among other reasons, the claims of the '973 patent are invalid under 35 U.S.C. §§ 102 and/or 103 in light of prior art that published or was otherwise available to the public before the earliest possible priority date of the '973 patent, including, for example, the prior art Alvotech USA produced or otherwise identified to AbbVie Inc. with Alvotech USA's detailed statement.  Alvotech USA's detailed statement addressing invalidity of the '973 patent is within AbbVie's possession and is incorporated by reference herein.

93.     On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. responded to Alvotech USA's detailed statement addressing validity of the '973 patent and purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that the '973 patent is not invalid.  AbbVie filed a suit for infringement of the '973 patent against Alvotech hf. on April 27, 2021 in this Court.

94.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to whether the claims of the '973 patent are invalid for failure to comply with the requirements of Title 35 of the United States Code,

including without limitation, one or more of §§ 101, 102, 103, 112, and/or pursuant to common law and/or equitable doctrines.

95.     Alvotech hf. is entitled to a judicial declaration that all claims of the '973 patent are invalid.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT IX

### (Declaratory Judgment of Unenforceability for Inequitable Conduct

### Regarding U.S. Patent No. 8,961,973)

96.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

97.     On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing the factual and legal bases for Alvotech USA's opinion that the '973 patent is unenforceable.  Alvotech USA's detailed statement addressing unenforceability of the '973 patent is within AbbVie's possession and is incorporated by reference herein.

98.     In order to obtain claims on induction dosing regimens, AbbVie argued to the Examiner that a person of skill would be concerned about doses of adalimumab greater than 40 mg/ml.  Yet AbbVie knew that its predecessor had run prolonged safety studies that showed adalimumab was safe in doses up to five times greater than the claimed induction doses. Specifically, during the prosecution of U.S. Patent No. 8,889,136 (a parent to the '973 patent), AbbVie Biotechnology Ltd. made the decision to misrepresent the totality of the safety and efficacy data for adalimumab and to not highlight the references that it knew to be of the most significance.  On information and belief, AbbVie Biotechnology Ltd. did so with the specific intent

to mislead or deceive the Patent Office and with knowledge that the misrepresentations were material to patentability.

99.     AbbVie's predecessors sponsored and published the results of clinical trials of adalimumab in rheumatoid arthritis patients (called "DE001/003") that included administration of up to 10 mg/kg adalimumab (approximately 800 mg for a typical 80 kg patient) every other week for up to 2 years.  (*See, e.g.*, **Exhibit A**, Rau 2002 at Table 1 (describing DE001/003 studies); *id.* at ii71-72; **Exhibit B**, Kempeni 1999 at I71; **Exhibit C**, Kempeni 2000 at i44, **Exhibit D**, Rau 2000 at 4; *id.* at Table 1; **Exhibit E**, den Broeder 2001 at 45-46.)  The higher initial doses reported by AbbVie's predecessors are five times larger than the largest doses claimed in the 8,889,136 patent.  Rau 2002 reported that "[a]dalimumab was well tolerated in this study.  The safety profile of a single doses of adalimumab was comparable to that of placebo."  (**Exhibit A**, Rau 2002 at ii72.)  Kempeni 1999 reported that "the dose increment scheme was followed as planned reaching the maximum dose of 10 mg/kg without any evidence of clinically relevant or dose related adverse effects."  (**Exhibit B**, Kempeni 1999 at I71; *see also id.* ("After six months, 86% of patients continued to receive treatment with D2E7 indicating that long term intravenous treatment with D2E7 in the dose range from 0.5 to 10 mg/kg was well tolerated.").)  Kempeni 2000 reported that "[i]n the long term open label extensions, a high percentage of patients continued to receive treatment with D2E7 indicating the long term treatment with D2E7 in the dose range from 0.5 to 10 mg/kg was well tolerated."  (**Exhibit C**, Kempeni 2000 at i44.)

100.     AbbVie's predecessors published additional studies demonstrating safety and efficacy of weekly dosing of adalimumab at and above 40 mg.  Rau 2002 and Kempeni 2000 describe DE007, in which patients with active RA were given 20 mg, 40 mg, or 80 mg adalimumab weekly or placebo for 12 weeks.  (**Exhibit A**, Rau 2002 at ii72; **Exhibit C**, Kempeni 2000 at i45.)

Rau 2002 concludes, "[t]he three doses of adalimumab were similarly well tolerated, the 40 mg and 80 mg doses were equally effective while the 20 mg dose was somewhat less effective." (**Exhibit A**, Rau 2002 at ii72.)   Additionally, Rau 2002 stated, "DE007 demonstrated that adalimumab treatment produces rapid, sustained responses and is safe and well tolerated, with no dose limiting side effects."  (*Id.* (emphasis added); *see also* **Exhibit C**, Kempeni 2000 at i45 ("All three doses of D2E7 were efficacious . . . and no dose response relation was apparent at month 3.").)

101.    Additionally, AbbVie's predecessors published results from study DE010, in which patients were given 1 mg/kg (equivalent to 80 mg in a typical 80 kg patient) every other week for up to 2 years.  (**Exhibit A**, Rau 2002 at ii72-73; *see also* **Exhibit C**, Kempeni 2000 at Table 1.)  The authors of Rau 2002 concluded that "repeated subcutaneous injections of 1 mg/kg adalimumab over a period of two years provides sustained efficacy and is well tolerated . . . ."  (*Id.* at ii73.)

102.    Kempeni 1999 additionally discussed a clinical trial in which patients received 0.5 mg/kg adalimumab subcutaneously weekly and were up-dosed to 1 mg/kg if initially not responsive.  (**Exhibit B**, Kempeni 1999 at I71-72.)  After three months of treatment, Kempeni 1999 reports, "[w]ith the exception of mild and transient injection site reactions, adverse events occurred with the same frequency and distribution in the D2E7 and placebo groups.  The investigators concluded that D2E7 given subcutaneously was safe and as effective as when administered intravenously . . . ."  (*Id.* at I72.)

103.    Kempeni 2000, which discussed DE001/003, DE007, and DE010, concluded that "[t]reatment with D2E7 has been well tolerated.  The rate and severity of adverse events were comparable between all dosage groups of D2E7 and placebo."  (**Exhibit C**, Kempeni 2000 at i45.)

104. Den Broeder 2001, another reference from a person associated with AbbVie's predecessor looking at the prior studies on adalimumab, concluded that "[s]tudies in more than 1200 patients have demonstrated the efficacy and safety of prolonged administration of this compound either alone or in combination with methotrexate." (**Exhibit E**, den Broeder 2001 at 45.)

105. On information and belief, AbbVie Biotechnology Ltd. knew the information regarding all of the safety data was material to the prosecution of AbbVie Biotechnology Ltd.'s claims, including the DE001/003, DE007, and DE010 studies. AbbVie also knew that all of this safety data was in the prior art, including in Rau 2002, Kempeni 1999, Kempeni 2000, Rau 2000, and den Broeder 2001. It also knew that the Examiner had hundreds of references to review and consider. But AbbVie Biotechnology Ltd. made a deliberate decision to misrepresent the totality of the safety and efficacy data for adalimumab and to not highlight the prior art references that it knew to be of the most significance with the intent to deceive the Patent Office. AbbVie Biotechnology Ltd.'s arguments regarding the danger of adalimumab induction doses above 40 mg are directly contradicted by the published prior art studies sponsored by its predecessors demonstrating the safety of adalimumab. This misconduct of misleading the Patent Office regarding the safety of 160 and 80 mg adalimumab induction dosing tainted numerous patents across the related patent families, including at least the '973 patent.

106. During prosecution of U.S. Patent No. 8,889,136, AbbVie Biotechnology Ltd. through its prosecuting attorneys (including Raymond M. Doss of Ropes & Gray LLP), told the Patent Office that "the increased rates of infections provided the skilled artisan in April 2004 with a motivation to not use doses of adalimumab greater than 40 mg" (File History of U.S. Patent No. 8,889,136 ("'136 File History"), 3/18/2014 Remarks Made in Amendment at 27 (emphasis in

original)), despite publication of the study sponsored by its predecessor demonstrating safety of doses up to 800 mg every other week for up to two years.  (*See* **Exhibit A**, Rau 2002 at Table 1, ii70, ii72; *see also* **Exhibit D**, Rau 2000 at Table 1; *see also* **Exhibit E**, den Broeder 2001 at 45-46.)

107.    AbbVie Biotechnology Ltd., through its prosecuting attorneys (including Mr. Doss) and its declarant expert (Dr. Diane Mould), argued to the Patent Office that "the person of ordinary skill would have considered these risks when contemplating a dosing regimen involving simultaneously administering four times the approved dose of HUMIRA (160 mg) for rheumatoid arthritis followed two times the approved dose (80 mg) as required by the claimed methods for inducing remission of Crohn's disease."   ('136 File History, 3/18/2014 Remarks Made in Amendment at 27 (emphasis in original); *see also* '136 File History, 3/17/2014 Declaration of Dr. Diane Mould at 13 (same).)

108.    By focusing on the "approved" dosing for rheumatoid arthritis, AbbVie purposefully misdirected the Patent Office away from its predecessors' publications demonstrating the safety and efficacy of dosing higher than 40 mg every other week.  These publications include Rau 2002, Kempeni 1999, Kempeni 2000, Rau 2000, and den Broeder 2001—all of which AbbVie Biotechnology Ltd. knew were in the prior art.  As described above, Rau 2002 and Kempeni 2000 reported the safety of repeated adalimumab doses up to and including 800 mg (DE001/003), as well as the safety and efficacy of 40 mg and 80 mg weekly adalimumab doses for 3 months (DE007) and approximately 80 mg every other week dosing for 2 years (DE010).  (**Exhibit A**, Rau 2002 at Table 1, ii72-73; **Exhibit C**, Kempeni 2000 at Table 1.)  Kempeni 1999 likewise reported on the safety of repeated adalimumab doses up to and including 800 mg (or 10 mg/kg), as well as 40 mg (0.5 mg/kg) and 80 mg (1 mg/kg) weekly dosing.  (**Exhibit B**, Kempeni 1999 at

I71-72.)  With regard to DE007, which reported on 80 mg weekly adalimumab dosing, the authors of Rau 2002 reported that adalimumab "produces rapid, sustained responses and is safe and well tolerated, with no dose limiting side effects."  (**Exhibit A**, Rau 2002 at ii72; *see also* **Exhibit C**, Kempeni 2000 at i45.)

109.    AbbVie Biotechnology Ltd. was aware of the safety of prolonged adalimumab dosing above 40 mg at least as early as 2000, as demonstrated in the publication of Kempeni 2000. (**Exhibit C**, Kempeni 2000 at i44 ("In the long term open label extensions, a high percentage of patients continued to receive treatment with D2E7 indicating that long term treatment with D2E7 in the dose range from 0.5 to 10 mg/kg was well tolerated."); *see also* **Exhibit A**, Rau 2002 at ii72-73; **Exhibit E**, den Broeder 2001 at 45 ("Studies in more than 1200 patients have demonstrated the efficacy and safety of prolonged administration of this compound either alone or in combination with methotrexate."); **Exhibit B**, Kempeni 1999 at I72 (After three months of 0.5 mg/kg or 1 mg/kg dosing, "[t]he investigators concluded that D2E7 given subcutaneously was safe and as effective as when administered intravenously.").)  On information and belief, AbbVie Biotechnology Ltd. knew the information in Rau 2002, Kempeni 1999, Kempeni 2000, Rau 2000, and den Broeder 2001 was material to the prosecution of AbbVie Biotechnology Ltd.'s claims. AbbVie Biotechnology Ltd. made a deliberate decision to misrepresent the totality of the safety and efficacy data for adalimumab and to not highlight the references that it knew to be of the most significance with the intent to deceive the Patent Office.  These material misrepresentations and misleading statements to the Patent Office were directly refuted by credible evidence in Rau 2002, Kempeni 1999, Kempeni 2000, Rau 2000, and den Broeder 2001.  This misconduct of not highlighting the references known to be of the most significance and misleading the Patent Office

regarding the safety of doses above 40 mg tainted numerous patents across the related patent families, including at least the '973 patent, which is a continuation of the 8,889,136 patent.

110.     AbbVie filed a suit for infringement of the '973 patent against Alvotech hf. on April 27, 2021 in this Court.

111.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to whether the claims of the '973 patent are unenforceable due to AbbVie's inequitable conduct.

112.     Alvotech hf. is entitled to a judicial declaration that all claims of the '973 patent are unenforceable.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT X

### (Declaratory Judgment of Non-infringement of U.S. Patent No. 9,085,619)

113.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

114.     Alvotech hf. has not infringed and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '619 patent under 35 U.S.C. § 271.  On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases for Alvotech opinion that it will not infringe the '619 patent.  Alvotech USA's detailed statement is within AbbVie's possession and is incorporated by reference herein.  In addition, Plaintiffs cannot be liable for any infringement of the '619 patent because it is invalid and unenforceable.

115.     On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that Alvotech hf. will infringe the '619 patent.  AbbVie filed a suit for infringement of the '619 patent against Alvotech hf. on April 27, 2021 in this Court.

116.     As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to the infringement of the '619 patent.

117.     Alvotech hf. is entitled to a judicial declaration that the making, use, offer for sale, sale, or importation into the United States of Alvotech hf.'s biosimilar product does not and will not infringe any valid and enforceable claim of the '619 patent under 35 U.S.C. § 271.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## COUNT XI

### (Declaratory Judgment of Invalidity of U.S. Patent No. 9,085,619)

118.     Alvotech hf. re-alleges the foregoing paragraphs of its counterclaims as if fully set forth herein.

119.     Alvotech hf. has not infringed and will not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '619 patent under 35 U.S.C. § 271.  On January 14, 2021, Alvotech USA provided AbbVie Inc. with a detailed statement pursuant to 42 U.S.C. § 262(*l*)(3)(B) describing, on a claim by claim basis, the factual and legal bases for Alvotech USA's opinion that Alvotech hf. will not infringe the '619 patent.  Alvotech USA's detailed statement is within AbbVie's possession and is incorporated by reference herein. In addition, Alvotech hf. cannot be liable for any infringement of the '619 patent because it is invalid and unenforceable.

120.    On March 15, 2021, and pursuant to 42 U.S.C. § 262(*l*)(3)(C), AbbVie Inc. purported to provide Alvotech USA with its factual and legal bases for AbbVie Inc.'s opinion that Alvotech hf. will infringe the '619 patent.  AbbVie filed a suit for infringement of the '619 patent against Alvotech hf. on April 27, 2021 in this Court.

121.    As a result of AbbVie's allegations against Alvotech hf., an actual and justiciable controversy exists between Alvotech hf. and AbbVie as to the infringement of the '619 patent.

122.    Alvotech hf. is entitled to a judicial declaration that the making, use, offer for sale, sale, or importation into the United States of Alvotech hf.'s biosimilar product does not and will not infringe any valid and enforceable claim of the '619 patent under 35 U.S.C. § 271.  Such a declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

## PRAYER FOR RELIEF

WHEREFORE, Defendant respectfully request that this Court enter judgment in its favor against AbbVie Inc. and AbbVie Biotechnology Ltd. and grant the following relief:

A.    Declare that Defendant has not, does not, and will not infringe any valid and enforceable claim of the patents-in-suit;

B.    Declare that the claims of the patents-in-suit are invalid;

C.    Declare that all of the patents-in-suit are unenforceable;

D.    Enjoin and restrain Plaintiffs and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them from pursuing further charges of infringement or acts of enforcement based on the patents-in-suit against Defendant or its actual and prospective business partners, customers, suppliers, clinical investigators, and anyone in privity with Defendant;

E.    Deny Plaintiffs any request for injunctive relief and any other remedy available under Title 35 of the United States Code;

F.    Declare that this is an exceptional case in favor of Defendant and award Defendant its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.    Award Defendant taxable costs and interest; and

H.    Award any and all such relief as the Court determines to be just and proper, including pursuant to 28 U.S.C. § 2202.

## JURY DEMAND

Plaintiffs hereby demand a jury trial in this action for any issue so triable.

Date:  September 14, 2021                    ALVOTECH HF.

By: */s/  Louis E. Fogel*
      Louis E. Fogel (# 6281404)
      **JENNER & BLOCK LLP**
      353 N. Clark St.
      Chicago, IL 60654
      Tel: 312-222-9350 / Fax: 312-527-7764
      Email: lfogel@jenner.com

      Jonathan Singer
      **FISH & RICHARDSON P.C.**
      12860 El Camino Real, Ste. 400
      San Diego, CA 92130
      Tel: 858-678-5070 / Fax: 858-678-5099
      Email: singer@fr.com

      Martina Tyreus Hufnal
      Douglas E. McCann
      **FISH & RICHARDSON P.C.**
      222 Delaware Ave, 17th Fl.
      Wilmington, DE 19801
      Tel: 302-652-5070 / Fax: 302-652-0607
      Email: tyreushufnal@fr.com;
      dmccann@fr.com

      *Attorneys for ALVOTECH HF.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 14, 2021 I caused a true and correct copy of the foregoing to be electronically served on counsel of record via the Court's CM/ECF system.


/s/ *Louis E. Fogel*          
Louis E. Fogel