**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABBVIE INC. and ABBVIE | ) | |
| BIOTECHNOLOGY LTD., | ) | |
| | ) | Case No. 1:21-cv-2258 |
| Plaintiffs, | ) | Case No. 1:21-cv-2899 |
| | ) | |
| v. | ) | Hon. Judge John Z. Lee |
| | ) | |
| ALVOTECH HF., | ) | Magistrate Judge M. David Weisman |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT ALVOTECH HF.'S OPENING CLAIM CONSTRUCTION BRIEF
PURSUANT TO LPR 4.2(a)**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................ 1

CLAIM CONSTRUCTION LEGAL STANDARDS............................................................ 2

    I.    Intrinsic and Extrinsic Evidence ................................................................ 2

    II.   Intrinsic Evidence Demonstrating an Essential Step ................................. 2

    III.  Indefiniteness ............................................................................................ 3

    IV.  Means-Plus-Function Terms ...................................................................... 3

ARGUMENT ............................................................................................................... 5

    I.    The '792 Patent ........................................................................................ 5

        A.   Background of the '792 Patent .................................................... 5

        B.   Disputed Claim Terms ................................................................. 7

            1.    "a level of fluorescent activity no greater than 0.0144 RFU/sec" .. 7

            2.    "no detectable level of fluorescent activity"................................ 11

    II.   The '619 and '030 Patents .................................................................... 12

        A.   Background of the '619 and '030 Patents................................. 12

        B.   Disputed Claim Term: "wherein the formulation does not comprise a buffering system"................................................. 13

            1.    The Intrinsic Evidence Dictates that Formulation in Pure Water is an Essential Part of the Claimed Invention ............................ 14

            2.    Because Formulation in Pure Water is an Essential Part of the Invention, the Case Law Dictates that it Must Limit the Claims.. 17

            3.    AbbVie's Proposed Construction is Impermissibly Broad........... 19

    III.  The '686 Patent...................................................................................... 20

        A.   Background of the '686 Patent .................................................. 20

        B.   Disputed Claim Terms ............................................................... 20

            1.    "an actuator to deploy the plunger spring" .................................. 20

            2.    "an interlocking assembly in communication with the shroud, . . . having a first condition to maintain the shroud in the retracted

i

position and a second condition to deploy the shroud spring and
allow movement of the shroud toward the extended position"..... 23

IV. The '973 Patent ................................................................................... 26

    A. Background of the '973 Patent ................................................ 26

    B. Disputed Claim Term: "achieving clinical response"............................. 27

CONCLUSION.................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007)................................................................................3, 14, 18

*Berkheimer v. Hewlett-Packard Co.*,
    No. 12-cv-9023, 2015 WL 4999954 (N.D. Ill. Aug. 21, 2015) (Lee, J.), *aff'd*
    *sub nom. Berkheimer v. HP Inc.,* 881 F.3d 1360 (Fed. Cir. 2018) ......................................3, 9

*Dow Chem. Co. v. Nova Chem. Corp. (Can.)*,
    803 F.3d 620 (Fed. Cir. 2015)......................................................................................9, 29, 30

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)...............................................................................................30

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
    341 F.3d 1332 (Fed. Cir. 2003)..................................................................................................9

*Honeywell Int'l, Inc. v. ITT Indus.*,
    452 F.3d 1312 (Fed. Cir. 2006)..................................................................................................2

*Indivior Inc. v. Dr. Reddy's Labs., S.A*,
    752 Fed. App'x 1024 (Fed. Cir. Nov. 20, 2018).....................................................................18

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014).......................................................................................3, 8, 11

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006)...............................................................................................21

*Medicines Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017).............................................................................1, 17, 18, 19

*Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.*,
    248 F.3d 1303 (Fed. Cir. 2001)..........................................................................................4, 22

*MTD Prods., Inc. v. Ionescu*,
    933 F.3d 1336 (Fed. Cir. 2019)..........................................................................4, 21, 24, 25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014).........................................................................................3, 7, 11, 27

*Pac. Coast Bldg. Prods. v. CertainTeed Gypsum, Inc.*,
    816 F. App'x 454 (Fed. Cir. 2020) ...................................................................................9, 10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................2

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)..........................................................................2

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007)........................................................................16

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995)..........................................................................18

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013)........................................................................16

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991)..........................................................................4

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015).....................................................................9, 29

*Welker Bearing Co. v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008)..........................................................................4

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (en banc)..................................................4, 21, 24

**Statutes**

35 U.S.C § 112..........................................................................................*passim*

## INTRODUCTION

The six terms for *Markman* construction provide the Court with its first opportunity to examine substantively AbbVie's assertions about its self-styled patent "minefield." And, as should be no surprise, they come up wanting.

Three of the terms for construction are so vague as to be indefinite, with terms in the '792 patent being the most egregious. That patent, which AbbVie asserts covers "highly pur[e]" adalimumab, (D.I. 49, 50:12), essentially seeks to reclaim adalimumab from the prior art, by claiming the lowering or elimination of a contaminant—procathepsin L—that the prior art had already eliminated. To achieve this end, the patent uses deliberately obfuscatory claim language: so-called "RFU" values that are arbitrary and fail to relate those values to any particular concentration of procathepsin L. The '792 terms for construction are plainly indefinite.

The other three terms demonstrate AbbVie's stretching of its patents in order to capture competitors. Chief among these are AbbVie's so-called "bufferless" patents, one of which, in violation of the Patent Dance confidentiality provisions, newly copies Alvotech's proprietary formulation into its claims. Regardless of this extra-legal behavior, those patents make clear to skilled artisans that their invention requires use of a particular process to achieve a bufferless formulation, and not that AbbVie invented all bufferless formulations of adalimumab. Under binding Federal Circuit precedent, the Court should limit the claims to bufferless formulations made with the disclosed process, thereby confining AbbVie's claims to what its patents say AbbVie actually invented. *See Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017). Accordingly, Alvotech respectfully requests that the Court adopt Alvotech's proposed constructions.

1

## CLAIM CONSTRUCTION LEGAL STANDARDS

**I.      Intrinsic and Extrinsic Evidence**

In construing claims, courts look to, in order of significance, "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Within this framework, the claims should be construed "so as to be consistent with the specification," *id.* at 1316, as it is the "single best guide to the meaning of a disputed term" and is usually dispositive. *Id.* at 1315. And while the prosecution history may lack the same clarity as the specification, it nonetheless "provides evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. Courts may also consider extrinsic evidence, such as dictionaries and treatises, as well as expert testimony, to "help educate the court regarding the field of the invention and . . . help the court determine what a person of ordinary skill in the art would understand claim terms to mean," but such evidence should be considered in the context of the intrinsic record. *Id.* at 1319.

**II.      Intrinsic Evidence Demonstrating an Essential Step**

Where the specification consistently characterizes "the invention" as limited in a particular way, the claims should be read consistent with this characterization. *See Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318–19 (Fed. Cir. 2006); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."). This includes situations where the specification teaches that a process is an essential step in a claimed invention. Although claims to compositions are not generally limited to the process used to make them, where the intrinsic record demonstrates that the process "is an essential step" in making the product of the invention, the process is "a

2

necessary limitation of the claims." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007).

### III.    Indefiniteness

Patent claims must "particularly point[] out and distinctly claim[] the subject matter" regarded as the invention. 35 U.S.C. § 112(b). As interpreted by the Supreme Court, this means that claims must "inform those skilled in the art about the scope of the invention with reasonable certainty," considered in light of the specification and prosecution history. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Thus, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 899. In other words, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

Claims that fail these standards are indefinite and are invalid. *See Nautilus*, 572 U.S. at 902. Because it involves the meaning of claim terms, the issue of indefiniteness can properly be decided at the claim construction stage. *See, e.g.*, *Berkheimer v. Hewlett-Packard Co.*, No. 12-cv-9023, 2015 WL 4999954, at *10–11 (N.D. Ill. Aug. 21, 2015) (Lee, J.), *aff'd sub nom. Berkheimer v. HP Inc.,* 881 F.3d 1360 (Fed. Cir. 2018) (finding term indefinite at claim construction stage).

### IV.    Means-Plus-Function Terms

Under 35 U.S.C. § 112(f), and its predecessor 35 U.S.C § 112(6), a claim element in a combination "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Such elements are known as "means-plus-function" terms.

Most commonly, "means-plus-function" terms use the word "means," followed by the

particular function, such that, if a claim does not use the word "means," there is a rebuttable presumption that it is not subject to § 112(f). *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 (Fed. Cir. 2015) (en banc) ("distributed learning control module" governed by § 112(6) even though phrase did not use term "means"). But that presumption is rebutted where "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). The "essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348.

Under these standards, courts frequently find that terms other than "means"—including terms very similar to those at issue here like "mechanism" and "mechanical control assembly"—are "nonce word[s]" or "verbal construct[s]" that are "not recognized as the name of structure" and are "simply [] substitute[s] for the term 'means for,'" and must be construed as means-plus-function terms. *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1096 (Fed. Cir. 2008) (finding term "mechanism" subject to § 112, ¶ 6); *MTD Prods., Inc. v. Ionescu*, 933 F.3d 1336, 1345 (Fed. Cir. 2019) (finding term "mechanical control assembly" subject to § 112, ¶ 6).

Once it determines a claim term is in means-plus-function format, a court must undertake two additional inquiries. First, a court determines "the function of the means-plus-function limitation." *Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Second, with that function in mind, a court must "determine the corresponding structure disclosed in the specification." *Id.* Infringement and validity of the claim using the term is then determined based on that structure, and any equivalents thereof. *See, e.g.*, *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991).

4

**ARGUMENT**

I.     **The '792 Patent**

A.     **Background of the '792 Patent**

The '792 patent relates to methods for purifying an antibody from the host cells that produced it. (JA002017, 1:55-58.) "Host cells" are the genetically engineered cells that are used to make a particular antibody, like adalimumab. Host cells produce or contain other proteins in addition to the desired antibody, which are referred to as "host cell proteins" or "HCPs." One of the HCPs is procathepsin L. To be used in a pharmaceutical composition, the antibody has to be separated from these HCPs. (*Id.* at 1:36-49.)

Typically, as the '792 patent states, HCPs are separated from the antibody by a purification process that uses Protein A. (JA002034, 36:54-56.) But AbbVie chose a different purification process that relies on ion exchange separation, particularly cation exchange or "CEX," instead of Protein A. (JA002035, 37:18-56.) AbbVie's purification strategy leads to "a greater burden on the subsequent steps for purification and clearance of host cell protein and potential virus contamination." (Ex. 1, ALV0204229.)[1] The procathepsin L purification methods in the '792 patent are thus an attempt to solve a problem created by AbbVie's own process, but not seen in Alvotech's Protein A process.

But AbbVie did not limit its claims to solving its CEX problem. Instead, the '792 patent purports to cover any adalimumab composition with low levels of procathepsin L regardless of the manufacturing process. And rather than straightforwardly claiming such a composition—by, for example, specifying a particular concentration of procathepsin L—AbbVie chose to obfuscate its patent by claiming its "invention" through the use of its own "cathepsin L kinetic assay," which in

---

[1] All numbered exhibits herein are attached to Mr. Fogel's declaration filed in support of this brief.

turn relies on units of measurement called "relative fluorescence units" (RFUs).

According to the '792 specification, the "cathepsin L kinetic assay" uses fluorescent activity to determine the amount of procathepsin L in a composition. (*See* JA002040, 47:5-48:44; JA002073, 113:65-114:60.) Generally, the assay forces the conversion of the HCP procathepsin L into the active form called cathepsin L. (*Id.*) This active form can react with a substrate, causing the substrate to release a fluorescent group. (*Id.*) In principle, as more fluorescent groups are released from the substrate, the higher the resulting fluorescent signal. (*Id.*) The '792 patent states that the rate of release of the fluorescent groups is "directly proportional to the amount of cathepsin L [and thus procathepsin L] in the sample." (JA002040, 47:62-64.) Accordingly, the kinetic assay measures the increase in fluorescence over time, e.g., "the slope of the fluorogenic signal generated by cleavage of the substrate per second." (JA002073, 114:55-57.) This slope is called the "fluorescent activity." (*Id.*) The '792 patent expresses the fluorescent activity in units of "RFU/sec." While RFU is not defined in the '792 patent, a skilled artisan understands "RFU" to mean "relative fluorescence unit." (Lenhoff Decl., ¶ 67.)

AbbVie, however, chose not to disclose what the RFU measurements in its patent were "relative" to. Without this information, a skilled artisan has no way of knowing what the RFU values in the claims (or the specification) mean. Moreover, as detailed further below, RFUs vary widely based on how the measurement is obtained. Thus, the measured RFU values for a given sample, and even the detectability of the fluorescence activity of a given sample, might differ for different machines, or even for the same machine under different settings or conditions. Indeed, for these reasons, the manufacturers of such machines describe RFU values as "arbitrary" units of measurement. (Ex. 2.) AbbVie's claiming strategy, using these arbitrary units, renders the claims indefinite.

6

**B.** **Disputed Claim Terms**

    **1.** **"a level of fluorescent activity no greater than 0.0144 RFU/sec"**

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| a level of fluorescent activity no greater than 0.0144 RFU/sec<br><br>(Asserted claim 1 of the '792 patent) | "RFU" or "relative fluorescence unit" is indefinite | Not indefinite/plain and ordinary meaning, *i.e.*, "the level of fluorescent activity observed is no greater than 0.0144 RFU/sec when measured using the recited cathepsin L kinetic assay" |

Without a disclosed reference standard, the recitation of RFU and RFU/sec is meaningless and renders the claims indefinite. RFUs are understood by skilled artisan to be an "arbitrary unit of measurement." (Lenhoff Decl., ¶ 67; *see also* Ex. 2 ("RFU values are arbitrary . . . "); JA002361 ("[L]ight intensity is usually reported in arbitrary units, such as relative fluorescence units (rfu).").) A claim that recites a numerical value of arbitrary units fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.

The purpose of the kinetic assay, according to the '792 patent, is "for determining the amount of procathepsin L in a sample." (JA002040, 47:7-9.) Yet the actual amount of procathepsin L in a sample is not discernable from the '792 patent. By itself, the measure of fluorescent activity in RFU/sec is meaningless in defining the amount of procathepsin L.

This shortcoming was well known in the art. For example, suppliers of spectrometers, such as Thermo Fisher Scientific, warn users that "RFU values are arbitrary and dependent upon the instrument settings (gain and voltage on the PMT), electrical input (voltage draws or surges), the age of the light source and the PMT, temperature, humidity, and other factors." (Ex. 2.) And that this arbitrariness even applies when you "use the exact same type/brand of microplate reader and microplates" as "RFU values are arbitrary and can vary between instruments, instrument settings, and the assay, even day to day on the same instrument." (*Id*.) Because of this, Thermo Fisher warns customers that they should not be surprised to get different RFU measurements for the same

sample. *See id.* In short, RFU and RFU/s values measured under different conditions and/or different times are not directly comparable.

By defining the adalimumab composition using fluorescent activity level solely in the arbitrary units of RFU/sec, the scope of the claimed composition is ambiguous and uncertain. The claims "must provide objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371. By itself, however, the claimed values in RFU/sec do not have an objective standard and cannot serve as a reasonable delimiter of a characteristic or amount of procathepsin L in the claimed adalimumab composition. Accordingly, the claims are ambiguous and indefinite.

This ambiguity might have been avoided. An RFU is a "relative" value that is meaningless, unless accompanied by a reference standard through which one can generate a calibration curve. (Lenhoff Decl., ¶ 44). To convert an RFU/sec value into a non-arbitrary value, such as nanograms of procathepsin L, scientists use reference samples with known quantities of cathepsin L or procathepsin L to create a calibration curve measured on a given machine under specific conditions. Then, a test sample can be measured on the same machine, under the same conditions, and in generally the same timeframe that the reference samples were measured. (*Id.*) Using the calibration curve, one can convert the measured RFU/sec values for a test sample to the amount of cathepsin L or procathepsin L.

In the absence of a calibration curve, a measured RFU value has no significance; it cannot be correlated to the amount of cathepsin L or compared to other RFU values measured under other conditions. (*Id.*) Indeed, the '792 patent admits that the observed fluorescence measurement must be "used in combination with a reference sample having known cathepsin L activity and known amount of cathepsin L." (JA002040, 47:64-48:1.) But the '792 patent fails to disclose such a reference standard, withholding the calibration curve(s) that correspond to the working examples.

Likewise, the actual amount of procathepsin L is not disclosed for any of the examples. Thus, the '792 patent does not include any reference that could give meaning to the claimed RFU measurement. The prosecution history is likewise unavailing. In short, the term is indefinite because neither the intrinsic nor extrinsic evidence "set[s] forth any objective standard for measuring [the] scope" of the claimed measurement. *See Berkheimer*, 2015 WL 4999954, at *10.

But that is not the only problem. The claimed "RFU/sec values" are also indefinite because they depend on the measurement process. The Federal Circuit has "previously found claims indefinite where the claim requires a specific measurement or calculation, more than one measurement method may be used and no guidance has been provided." *Pac. Coast Bldg. Prods. v. CertainTeed Gypsum, Inc.*, 816 F. App'x 454, 458 (Fed. Cir. 2020); *see also Dow Chem. Co. v. Nova Chem. Corp. (Can.)*, 803 F.3d 620, 634–35 (Fed. Cir. 2015) (claim reciting slope of strain hardening coefficient ≥ 1.3 held indefinite because four slope-measuring methods provided different results and insufficient guidance provided as to which, if any, was correct); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344 (Fed. Cir. 2015) (claimed molecular weight value held indefinite because it could be determined by three possible measures, which gave different numerical results, and intrinsic record did not teach which measure to use); *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003) (claimed melting point elevation of 2 to 10°C held indefinite because variations in sample preparation methods resulted in different values).

For example, in *Pacific Coast*, the claim was directed to drywall that required a particular value for the board's "scored flexural strength." 816 F. App'x at 456. The specification failed to teach how to measure the scored flexural strength "with reasonable certainty." *Id*. at 459. Expert testimony showed that "the score depth affects the result of the scored flexural tests, that the

9

configuration of the test and whether the results were averaged together significantly affected the value of the measurement, and that there are at least two methods of converting the measurement between board thicknesses that produce significantly differing results." *Id.* at 460. The Federal Circuit affirmed indefiniteness, noting that "the claims and specification fail to explain what the value represents or how to consistently and reproducibly measure this new characteristic" and this "create[d] significant problems for measuring scored flexural strength with any reasonable certainty." *Id.* at 459–60.

Like measuring the "scored flexural strength" value in *Pacific Coast*, measuring RFUs also varies based on a number of factors not specified in the '792 patent. These variables in measurement protocol include the type of instrument used, the settings of the instrument used, the age of the light bulb, or even the ambient humidity, among others. (Lenhoff Decl., ¶¶ 43-44; *see also id.* at ¶ 53 (discussing article that reported about 3X difference in RFUs when same sample was assayed on two different spectrometers).) Indeed, RFU data can vary by many multiples across various instruments even when testing the same sample. (*Id.* at ¶ 68.) Even within the same lab, measurements taken at different times or under different ambient conditions can vary. This is why, even within the same lab, a reference sample is typically included each time a test sample is run. (*Id.*; *see also* Ex. 3.) The problems are compounded when a third party in a different lab, with different instrumentation runs a test. In short, the raw RFU (or RFU/s) value simply is not meaningful without more information.

AbbVie's proposed construction does not save the claim from indefiniteness. The proposed construction merely provides that the relative fluorescence unit is "measured using the recited cathepsin L kinetic assay," which is nothing more than an acknowledgment of the remaining claim limitations that provide the materials for performing the cathepsin L kinetic assay. Those steps,

though, do nothing to rein in the "relative" and "arbitrary" nature of the RFU, nor do they inform a skilled artisan how to consistently or reproducibly measure RFUs because of all of the deficiencies discussed above.

Accordingly, "a level of fluorescent activity no greater than 0.0144 RFU/sec" is indefinite.

### 2. "no detectable level of fluorescent activity"

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| no detectable level of fluorescent activity<br><br>(Asserted claims 4, 7, 14, and 17 of the '792 patent) | "no detectable level" is indefinite | Not indefinite/plain and ordinary meaning, *i.e.*, "the level of fluorescent activity observed is not greater than background when measured using the recited cathepsin L kinetic assay" |

The term "no detectable level of fluorescent activity" is also indefinite. Whether fluorescent activity is "detectable" depends on the spectrometer being used as well as the precise conditions and instrumentation settings. A lab with a more sensitive instrument may detect fluorescence of a sample whereas another lab with a less sensitive instrument may not. And just as described above for "relative fluorescence unit," even the same machine, depending on the various settings and parameters used, will have variable levels of detection. (*See infra* § I.B.1.) Rather than defining an amount of procathepsin L in the adalimumab composition, the claim relies on the "unpredictable vagaries" of an individual's choice of spectrometer quality and settings. *See Interval Licensing*, 766 F.3d at 1371. Accordingly, "no[t] detectable" fails to "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.

AbbVie's proposed construction does not resolve the term's indefiniteness. AbbVie's proposed construction adds that the "level of fluorescent activity observed ***is not greater than background*** when measured using the recited cathepsin L kinetic assay." These words do not appear anywhere in the patent. Moreover, such measurements are still dependent upon the type of

11

instrument used, the sensitivity of the instrument, and the settings of that instrument. The '792 patent does not provide any disclosure of these specifics.

For these reasons, the term "no detectable level of fluorescent activity" is indefinite.

## II.  The '619 and '030 Patents

### A.  Background of the '619 and '030 Patents

The '619 and '030 patents share a common specification[2] and are generally directed to a process for making "bufferless" pharmaceutical formulations of a protein, such as adalimumab.

After host cells produce a protein like adalimumab, the protein must be purified from the host cells and cell culture media. (*See, e.g.*, JA001444, 15:35-39.) This typically involves a series of purification steps that introduce buffers (molecules used to control solution pH) and other molecules into the protein solution. (*See, e.g.*, JA001438, 4:19-23; JA001444, 15:59-16:5.) Buffers are routinely used in manufacturing antibodies, such as adalimumab, because certain manufacturing steps require specific pH values. (*See, e.g.*, Ex. 4, ¶¶ 22, 25.) At the end of the purification process, the protein is typically reformulated into a final formulation for administration to a patient. (JA001441, 10:32-34; JA001442, 11:4-7; JA001444, 15:35-39.)

The pharmaceutical formulations themselves may also include a mechanism for pH control, since pH can affect protein stability and aggregation. (*See, e.g.,* Ex. 4, ¶ 21.) Although some include buffers for pH control, aqueous pharmaceutical formulations of proteins ***without a buffer*** were well known before the filing of AbbVie's patents. (Exs. 5, 6.) These were sometimes described as "self-buffering" formulations because the protein itself provided the buffering function, without the need for an external buffer. (Exs. 5, 6.)

AbbVie's patents are directed to a specific way to achieve a bufferless formulation: through

---

[2] We cite to the specification of the '619 patent, unless noted otherwise.

"a diafiltration[3] process wherein a first solution containing the protein of interest is diafiltered using water as a diafiltration medium." (JA001438, 3:37-40.) Indeed, the Summary of the Invention states that "the methods and compositions of the invention are based on a diafiltration process wherein a first solution containing the protein of interest is diafiltered using water as a diafiltration medium." (*Id.* at 3:37-40.) The specification provides that the "water" used in the disclosed process is "pure water." (JA001442, 11:66-12:1)

Claim 16 of the '619 patent, from which asserted claims 18 and 28-30 depend, recites an aqueous formulation comprising an antibody and water, wherein the "formulation does not comprise a buffering system." Asserted claim 15 of the '030 patent recites the same limitation.

AbbVie seeks to expand these claims to cover *all* bufferless adalimumab formulations, despite the specification only disclosing formulations made by the disclosed process and repeatedly emphasizing the critical and essential nature of that process. AbbVie does this in an attempt to cover Alvotech's different manufacturing process, which does not use pure water. Such claim expansion should not be allowed.

**B.    Disputed Claim Term: "wherein the formulation does not comprise a buffering system"**

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| wherein the formulation does not comprise a buffering system (Claim 16 of the '619 patent (from which asserted claims 18 and 28-30 depend) and asserted claim 15 of the '030 patent) | The bufferless formulation is made by re-formulating the adalimumab into "pure water" | Plain and ordinary meaning, *i.e.*, "the formulation does not contain components other than adalimumab that meaningfully contribute to the buffering capacity of the formulation" The term is not limited to any process of preparation. |

---

[3] Diafiltration is a method that can be used for exchanging or removing the buffers in a protein solution which involves two steps: dilution and filtration. (*See* Ex. 4, ¶ 27, 29-31.)

**1. The Intrinsic Evidence Dictates that Formulation in Pure Water is an Essential Part of the Claimed Invention**

The term "wherein the formulation does not comprise a buffering system" should be read to include the essential processing step of re-formulating adalimumab into "pure water." Alvotech's proposed construction is consistent with the intrinsic record's repeated disclosure that re-formulation of adalimumab into "pure water" removes excipients and is the only way to achieve the bufferless formulation of the invention. Because the process of making the claimed formulations is taught as an "essential part of the claimed invention," it must be included in the construction of the claim. *Andersen*, 474 F.3d at 1375.

The '619 patent discusses the problems that can be caused by using excipients in high-concentration protein formulations, explaining that "[m]aintaining the stability and solubility of proteins in solution . . . is especially challenging in pharmaceutical formulations where [] additives are included into therapeutics." (JA001437, 1:66-2:2.) The patent describes drawbacks of prior art formulations as "requir[ing] additional excipients to maintain protein stability," and that the "[i]ngredients used to stabilize the protein may cause problems with protein stability over time or with protein stability in changing environments during storage." (*Id.* at 2:2-3, 16-19.)

The '619 patent purports to solve these problems by formulating proteins in water, defined as "pure water," using a diafiltration process to remove all excipients. The '619 patent "is directed towards the surprising finding that ***proteins formulated in water*** maintain solubility, as well as stability, even at high concentrations, during long-term liquid storage or other processing steps." (JA001438, 3:29-33.)[4] As the Summary of the Invention confirms, both "the methods ***and compositions*** of the invention ***are based on a diafiltration process wherein a first solution***

---

[4] All emphasis throughout this brief is added unless otherwise noted.

*containing the protein of interest is diafiltered using water as the diafiltration medium*." (*Id.* at 3:37-40.)

The specification repeatedly confirms that the '619 patent formulations must be prepared by the disclosed process, which is necessary to achieve the benefits of the claimed formulations:

- "*By performing the methods of the invention*, the *resulting aqueous formulation* has a significant decrease in the overall percentage of excipients in comparison to the initial protein solution." (*Id.* at 3:40-53.)

- "[T]he *formulation of the invention is based on using water as a formulation medium during the diafiltration process* and does not rely on traditional formulation mediums which include excipients, such as surfactants, used to solubilize and/or stabilize the protein in the final formulation." (JA001444, 15:42-46.)

- "*As a result of the diafiltration methods of the invention*, the concentration of solutes in the first protein solution is significantly reduced in the final aqueous formulation comprising essentially water and protein." (JA001449, 25:12-15.)

- "An important aspect of the invention is that the *diafiltered protein solution* (solution obtained following the diafiltration process of the first protein solution) can be concentrated. *By following this process*, it has been discovered that high concentrations of protein are stable in water." (*Id.* at 26:13-17.)

The specification continues to emphasize the essential connection between process and formulation throughout. "Section II," which describes the diafiltration "Methods of Invention," concludes by stating that "[a]dditional characteristics and advantages of aqueous *formulations* obtained *using the above methods* are described below in Section III." Section III is titled "Formulations of Invention." (*See* JA001450, 28:35-38; JA001444, 15:42-46.) This again confirms that the "Formulations of Invention" must be prepared "using the above methods"—i.e., the methods of diafiltering a first protein solution using water as the diafiltration medium. (*See also, e.g.*, JA001444, 15:42-50; JA001448, 23:4-10.) While the specification mentions "[a]lternative methods to diafiltration," such alternative methods uniformly require that the "protein is re-formulated into water in accordance with the invention," consistent with Alvotech's

15

proposed construction. (JA001448, 24:4-7; JA001444, 15:42-46.)

Re-formulating the protein in "water" has a specific meaning in the '619 patent—re-formulating it in "pure water." Indeed, the "Definitions" section of the specification expressly defines "water" as "pure water," explaining that "[t]he term water is intended to mean water that has been purified to remove contaminants, usually by distillation or reverse osmosis, also referred to herein as '***pure water***.'" (JA001442, 11:66-12:1; *see also* JA001441, 10:57-61.) Based on this definition, all uses of the term "water" in the patent refer to "pure water." *See, e.g.*, *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (holding that when specification "reveal[s] a special definition given to a claim term by the patentee . . . the inventor's lexicography governs" and "the patentee must be bound by the express definition").

The interference proceeding involving the '619 patent's parent, U.S. Patent No. 8,420,081, lends further support to "water" meaning "pure water" in these patents. *See Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1277 (Fed. Cir. 2013) (relying on interference as part of intrinsic record where patentee made "repeated and definitive remarks" as to the meaning of a claim term). AbbVie's expert in the interference testified that "[w]hen the term 'water' was used in the context of diafiltration in the 2005-2007 timeframe, it was understood that the water contained no added components, for example, salts or buffers." (Ex. 4, ¶ 36.) Dr. Zydney testified that this "plain meaning" of water in this context was "confirmed by the specification of the '081 patent," particularly the definition of "water" as "pure water." (*Id.* at ¶ 69.)

The prosecution history of the '619 patent also confirms the critical connection between re-formulation in pure water and the formulation itself. For example, the examiner "noted that the instant claims recite formulations which consist essentially of the antibody and water, do not comprise a tonicity modifier, or ***do not comprise a buffering system*** or are essentially free of a

buffer. *The instant specification teaches that such formulations are prepared by diafiltration with water* as an exchange medium." (JA001869.) In discussing the prior art, the examiner further noted that, during prosecution of the parent '081 patent, "Applicants argued that these cited references, and the prior art in general, teaches away from formulation of antibodies at concentrations of at least 20 mg/ml *without the use of ionic or ionizable excipients*," and found that argument to be "persuasive" for the '619 patent as well. (JA001871.) Thus, the examiner recognized what the specification makes plain—the bufferless formulations of the invention must be formulated using water as the medium, not by using a medium with excipients. The applicants did not challenge the examiner's findings.

### 2. Because Formulation in Pure Water is an Essential Part of the Invention, the Case Law Dictates that it Must Limit the Claims

Where, as here, the intrinsic record characterizes a process as an essential part of the invention, Federal Circuit precedent requires that the claims be construed to include that process. One case on point is *Medicines.* 853 F.3d 1296. That case involved two claims from the same patent family, both of which covered "pharmaceutical batches of a drug product comprising bivalirudin" that "have a [threshold] maximum impurity level." *Id.* at 1300. One claim required that the batches be "prepared by a compounding process comprising . . . efficiently mixing a pH-adjusting solution with the first solution," but the other claim did not expressly recite any process limitations. *Id.* Nonetheless, the Federal Circuit held that *both* claims must be construed to require the "efficient mixing" compounding process. *Id.* at 1303–06. In reaching this conclusion, the court found that the specification defined the "batches" of the invention as "batches prepared by *a same compounding process*" (*id.* at 1303) and that "efficient mixing" was the only adequately disclosed process. *Id.* at 1303–06. Notably, the court explained that "our decision does not impermissibly add a process limitation to a product claim . . . because the specification's definition of 'batches'

by itself injects a compounding process as a limitation in the asserted claims." *Id.* at 1304.

The Federal Circuit reached a similar conclusion in *Andersen*, where it construed the term "composite structural member" in a product claim to require preparation using "an intermediate step of pelletization or linear extrusion." 474 F.3d at 1375. The court first concluded that the specification described the pelletization process as "an essential step in the process [of manufacturing the claimed products] and thus a necessary limitation of the claims." *Id.* at 1373. The court also relied on the file history, where the applicant had distinguished prior art by describing the claimed products as being "prepared by" the pelletization process. Based on these facts, the court explained that the claims should be construed to include the process steps because "the patentee has made clear that the process steps are an ***essential part of the claimed invention***." *Id.* at 1375; *see also Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) (construing the term "sputter-deposited dielectric layer" as requiring preparation by a particular two-step process); *Indivior Inc. v. Dr. Reddy's Labs., S.A*, 752 Fed. App'x 1024, 1033 (Fed. Cir. Nov. 20, 2018) (construing "continuously cast film" to require a drying process and to exclude a particular way of drying that was disclaimed in the specification).

Here, just as in *Medicines* and *Anderson*, the '619 patent defines the bufferless formulations "of the invention" to include the described re-formulation process, and the intrinsic evidence makes clear that that process is essential to the invention. Like the definition of "batches" in *Medicines*, the '619 specification states that the "compositions of the invention" are "based on a diafiltration process wherein a first solution containing the protein of interest is diafiltered using water as the diafiltration medium." (JA001438, 3:37-40.) The only alternatives to diafiltration in water are other processes that similarly "re-formulate [the protein] into water." (JA001448, 24:4-7; *see also, e.g.*, JA001444, 15:42-46.) Similarly, just as the specification in *Anderson* stated that

18

the claimed products were "prepared by" the pelletization process, here the '619 specification states that the "Formulations of Invention" described in Section III are "prepared using the above methods" as described in Section II and describes the formulations of the invention as being "based on a diafiltration process wherein a first solution containing the protein of interest is diafiltered using water as the diafiltration medium." And like the specification in *Anderson*, the specification here attributes the "superior properties" of the product to the use of the specific process to make it. (*See, e.g.*, JA001450, 28:35-48 ("Additional characteristics and advantages of aqueous formulations obtained using the above methods are described below in section III.").)

As a result, the '619 specification itself "injects [the re-formulation in water] process as a limitation in the asserted claims," and requiring it "does not impermissibly add a process limitation to a product claim that does not require a process." *Medicines*, 853 F.3d at 1304.

### 3. AbbVie's Proposed Construction is Impermissibly Broad

AbbVie's proposed construction ignores the diafiltration process required by the specification. As AbbVie would have it, the claims would cover any formulation that does not contain components other than adalimumab that meaningfully contribute to the buffering capacity of the formulation, regardless of the process used to make the formulation. That proposed construction goes well beyond the invention that the specification discloses and is contrary to the specification's own refrain that "the ***formulation of the invention is based on using water as a formulation medium during the diafiltration process*** and does not rely on traditional formulation mediums which include excipients, such as surfactants, used to solubilize and/or stabilize the protein in the final formulation." (JA001444, 15:42-46.)

For all of the reasons above, "wherein the formulation does not comprise a buffering system" requires that the formulation is made by re-formulating the adalimumab into "pure water."

### III.    The '686 Patent

#### A.    Background of the '686 Patent

The '686 patent is generally directed to an autoinjector and method of using an autoinjector. As the specification describes, "[a]n autoinjector is generally a syringe configured to automatically extend a needle and inject a beneficial agent into a patient when a button or similar actuator is deployed." (JA000014, 1:45-48.) Autoinjectors were well known in the art prior to the '686 patent. (*See* Reinholtz Decl., ¶ 40.) The '686 patent thus purports to describe a new autoinjector with specific features. The claimed autoinjector includes a mechanism referred to as an "actuator" that has the function of deploying a plunger spring, which allows the injection of the beneficial agent into a patient. (*See, e.g.*, JA000014, 2:18-21.) It also includes a mechanism referred to as an "interlocking assembly" that initially maintains a needle shroud in a retracted position, and then deploys the shroud spring which allows the shroud to move into the extended position (*see, e.g.*, *id.* at 2:30-33). The needle generally moves forward out of the housing to make the injection. (*See, e.g.*, JA000015, 3:16-25.) After injection, the shroud moves from a retracted position to an extended position to cover the now extended and exposed needle post injection. (*See, e.g., id.* at 4:55-5:8.)

#### B.    Disputed Claim Terms

##### 1.    "an actuator to deploy the plunger spring"

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| an actuator to deploy the plunger spring<br><br>(Asserted claim 1 of the '686 patent) | Means-plus-function limitation<br><br>Function: to deploy the plunger spring<br><br>Structure: (i) a mechanical switch having an external digit interface surface, such as a button, or (ii) a frangible member ruptured by exerting digital pressure on an external digit interface surface or (iii) equivalent structures thereof | Plain and ordinary meaning, *i.e.*, "an actuator to facilitate expansion of the plunger spring" |

The parties dispute whether "an actuator to deploy the plunger spring" is a means-plus-function limitation and is therefore limited to the corresponding structure disclosed in the specification and equivalents thereof. Because an "actuator" is a functional term that does not describe a structure, Alvotech submits that it is. AbbVie argues that it is not, and instead would construe the claims to cover anything that actuates. As with the other disputed claim terms, AbbVie's construction is overbroad and seeks to expand the claims well beyond the disclosure.

Although there is a rebuttable presumption that this term is not subject to § 112(f) because it does not use the word "means," the presumption is rebutted because, just like the word "means," the word "actuator" introduces a function without disclosure of "sufficient structure" to perform the function. *See Williamson*, 792 F.3d at 1348–49. Like the terms "means" and "mechanism," "actuator" is a generic term that connotes no structure. *See Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure."); *see also MTD Prods.*, 933 F.3d at 1343–44 (term "mechanical control assembly" configured to actuate "does not have an established meaning in the art and instead merely operates as a generic label for a collection of parts").

Indeed, dictionaries define "actuator" in functional terms. (*See, e.g.*, Exs. 7-9.) For example, the second edition of the Dictionary of Materials and Testing defines "actuator" as "[a] device that actuates." (Ex. 7; *see also* Ex. 8 (defining actuator as "[a] component of a mechanical or electronic device that initiates a given action"); Ex. 9 (defining actuator as "[o]ne that activates, especially a device responsible for actuating a mechanical device").) An actuator is thus simply the noun form of the verb "actuate," and does not connote structure. Accordingly, a skilled artisan would read the term "an actuator to deploy the plunger spring" as "a *means* to deploy the plunger

21

spring." (Reinholtz Decl., ¶¶ 35-42.) The term is thus subject to § 112(f).

To properly construe this means-plus-function limitation, its function must first be determined. *See Medtronic*, 248 F.3d at 1311. The function proposed by Alvotech is expressly found in the claim language: "to deploy the plunger spring." AbbVie disagrees that this limitation is governed by § 112(f), and does not propose an alternative function if the Court finds that this term is a means-plus-function term. Accordingly, the function of the "actuator" means-plus-function limitation is "to deploy the plunger spring."

Next, with the function in mind, the Court must determine the corresponding structure disclosed in the specification. *See id.* at 1311. The specification of the '686 patent discloses two corresponding structures.

First, the specification discloses that "a ***mechanical switch*** has been shown in the drawings" of "actuator 500." (JA000017, 8:57-58.) The specification further describes that "[t]he actuator 500 further can be provided with a ***digit interface surface*** 520 for a user to press." (*Id.* at 8:33-35.) The specification goes on to disclose that when actuator 500 is pressed, "the plunger spring 480 is released and deployed to actuate the syringe 100." (*Id.* at 8:37-38.) Additionally, in the embodiments in Figures 4 and 7(a), the specification discloses that "the actuator 500 includes ***digit interface surface*** 520 formed on the surface of enlarged member 530." (*Id.* at 8:44-47.) In both disclosures, the digit interface surface is formed on an external surface of the claimed device. Accordingly, one corresponding structure disclosed in the specification is a mechanical switch having an external digit interface surface, such as a button.

Second, the specification discloses that "it would also be possible for the actuator to be a frangible member, such that the frangible member can be ruptured by exerting digital pressure on the digit interface surface 520 of the actuator 500, thereby releasing the plunger 400." (*Id.* at 8:58-

62.) Thus, the second corresponding structure disclosed in the specification is a frangible member ruptured by exerting digital pressure on an external digit interface surface.

AbbVie's proposed plain and ordinary meaning, on the other hand, finds no support in the intrinsic record. The claims do not use language similar to AbbVie's proposed "facilitat[ing] expansion" language. And the specification never describes the claimed actuator described as "facilitat[ing] expansion" of the plunger spring. Instead, the specification uses the same language found in the claims (and recited in Alvotech's proposed function) when discussing the actuator: deploying the plunger spring. (*See, e.g.*, JA000014-15, 2:20-21 ("The plunger spring can be deployed by an actuator."); 2:48-50 ("The engagement element acts to release the plunger and thus deploy the plunger spring when the actuator is actuated."); 4:60-61 ("The actuator is then actuated, thereby deploying the plunger spring.").) The prosecution history is silent on this issue.

For these reasons, "an actuator to deploy the plunger spring" is a means-plus-function limitation having the function and corresponding structures identified by Alvotech.

> **2. "an interlocking assembly in communication with the shroud, . . . having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the shroud toward the extended position"**

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| an interlocking assembly in communication with the shroud, … having a first condition to maintain the shroud in the retracted position and a second condition to deploy the shroud spring and allow movement of the | Means-plus-function limitation<br><br>Function: to maintain the shroud in a retracted position and then to deploy the shroud spring and allow movement of the shroud toward the extended position<br><br>Structure: an assembly containing an interlocking element such as a flexible tab or frangible member that engages with the shroud to maintain, prevent and hold the shroud in a retracted position, and a cam that biases a flexible tab or ruptures a frangible member to free the shroud to move toward the extended position, or equivalent structures thereof | Plain and ordinary meaning, *i.e.*, "an interlocking assembly in communication with the shroud, … having a first condition to support the shroud in the retracted position and a second condition to facilitate expansion of the shroud spring |

23

| shroud toward the extended position

(Asserted claim 1 of the '686 patent) | If the limitation is not means plus function, it has its plain meaning. The plain meaning of maintain is "hold" or "prevent." The plain meaning of deploy is "release." | and allow movement of the shroud toward the extended position" |
|---|---|---|

Like the term "actuator," the parties dispute whether the "interlocking assembly" term is a means-plus-function limitation. For similar reasons discussed above, Alvotech submits that it is.

The term "interlocking assembly" is also afforded a rebuttable presumption that it is not subject to § 112(f) because it does not use the word "means." But this presumption is rebutted because the term introduces a function without disclosure of any structure—let alone "sufficient structure" to perform the function. *See Williamson*, 792 F.3d at 1348–49. A skilled artisan would not understand this term as connoting any structure. (Reinholtz Decl., ¶¶ 43-53).

The Federal Circuit has found variations on the term "assembly" to be means-plus-function limitations. For instance, in *MTD Products*, the Federal Circuit held that "mechanical control assembly" failed to connote sufficient structure and thus was in means plus function format. 933 F.3d at 1343. The court reasoned that the term "mechanical control assembly" is "similar to other generic, black-box words that this court has held to be nonce terms similar to 'means' and subject to § 112, ¶ 6 because the term does not connote sufficiently definite structure to one of ordinary skill in the art." *Id.* Because of this, the court concluded that construction as a means-plus-function limitation was appropriate even though the term included some structural language. Specifically, even though "claim language reciting that the mechanical control assembly is 'coupled to the left and right drive units' connote[d] structure, the claim language reciting what the mechanical control assembly is 'configured to' do [wa]s functional." *Id.*

Like in *MTD Products*, the claim language here uses the nonce word "assembly." The verb added to the word, "interlocking," provides no additional structure; instead, like the "mechanical control" language in *MTD Products*, it denotes function. The rest of the claim language does not

24

change the result. It largely recites how the interlocking assembly functions: "to maintain the shroud in the retracted position and . . . to deploy the shroud spring and allow movement of the shroud toward the extended position." *See id.* at 1343. The only arguably structural language in the claim term is the requirement that the "interlocking assembly" is "in communication with the shroud." But like the "coupled to the left and right drive units" language in *MTD Products*, that language does not specify the structure of the "interlocking assembly" itself, but instead indicates that what the "interlocking assembly" is "configured to do is functional." *Id*. Thus, like the term "mechanical control assembly," the term "interlocking assembly" does not connote sufficient structure and is subject to § 112(f).

The function proposed by Alvotech is expressly found in the claim language: "to maintain the shroud in a retracted position and then to deploy the shroud spring and allow movement of the shroud toward the extended position." AbbVie disagrees that this limitation is governed by § 112(f), and does not propose an alternative function if the Court finds that this term is a means-plus-function term. Accordingly, the function of the "interlocking assembly" means-plus-function limitation is that proposed by Alvotech.

As to the corresponding structure, the specification of the '686 patent first discloses the use of a cam and flexible tabs to comprise the interlocking assembly. (JA000018, 10:66-11:9 ("For purpose of illustration, and not limitation; the interlocking assembly embodied in FIGS. 1-3 is provided with ***cam surface 917***. . . . In this manner, the ***flexible tabs*** 740 will be flexed outwardly to disengage seating surface 915 from portion 263.").) Alternatively, the specification discloses the use of frangible members for the interlocking assembly: "[I]nterlocking elements 915 can instead be frangible members configured to hold the shroud in its retracted position. These frangible members can be ruptured when the distal tabs 740 are splayed outwardly by engagement

25

surfaces 456 on platform 450." (JA000019, 11:35-40.) The specification does not disclose any additional other structures to perform the function above.

In response to AbbVie's proposed construction and to the extent the Court finds that the "interlocking assembly" is not a means-plus-function limitation (it is), the term has its plain and ordinary meaning, whereby "maintain" means "hold" or "prevent," and "deploy" means "release." The plain and ordinary meaning of these terms finds support in the specification. For example, the specification discloses that "[w]hen shroud 700 is in a retracted condition . . . surface 915 seats on outwardly projecting 263 of housing 200, thus *preventing* shroud 700 from moving toward its extended position." (JA000018, 10:55-59.) Similarly, the specification discloses that the "interlocking elements 915 can instead be frangible members configured *to hold* the shroud in its retracted position." (JA000019, 11:35-37.) Further, the specification discloses that "the act of squeezing the shroud would act to *release* the shroud 700." (JA000020, 14:40-42.) AbbVie's construction strays from the claim language, requiring that the interlocking assembly "*support* the shroud in the retracted position" and "*facilitate expansion* of the shroud spring." Such a rewrite finds no support in the intrinsic evidence.

For the reasons discussed above, the "interlocking assembly" term is a means-plus-function limitation having the function and corresponding structures identified by Alvotech.

## IV.    The '973 Patent

### A.    Background of the '973 Patent

The '973 patent relates to the use of anti-TNFα antibodies, such as adalimumab, to treat TNFα-related disorders such as Crohn's disease. (JA000106.) Crohn's disease is a form of inflammatory bowel disease that causes chronic inflammation in the gastrointestinal tract. Since at least the late 1990s, adalimumab had been suggested to treat a number of different TNFα-related disorders, including Crohn's disease. (*See* Ex. 10.)

26

The relevant claims of the '973 patent are directed to the use of multiple-variable dosing methods for "achieving clinical response" in Crohn's disease. In particular, claim 15 recites "[a] multiple-variable dose method for ***achieving clinical response*** of Crohn's disease in a subject in need thereof," comprising administering 160 mg of an anti-TNFα antibody followed by 80 mg of the anti-TNFα antibody two weeks later. Asserted dependent claims 26, 27, and 30 add the additional limitation that the antibody is adalimumab.

These asserted claims lack the clarity required by 35 U.S.C. § 112(b). Specifically, neither the claims nor the specification provides sufficient guidance as to the meaning of "achieving clinical response," a term that has multiple and various meanings both in the art and in the specification. The term is therefore indefinite.

### B. Disputed Claim Term: "achieving clinical response"

| Disputed Term | Alvotech's Proposal | AbbVie's Proposal |
|---|---|---|
| achieving clinical response<br><br>(Claim 15 of the '973 patent, which asserted claims 26, 27, and 30 depend) | "achieving clinical response" is indefinite | Not indefinite/plain and ordinary meaning, *i.e.*, "a meaningful therapeutic effect, as measured by CDAI score or similar, e.g., a decrease in CDAI of 70 points or more" |

"[A]chieving clinical response" as used in the claims at issue is indefinite because it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. "Achieving clinical response" has numerous different meanings in the context of Crohn's disease, with the specification itself expressly using two different standards in its examples and mentioning others. Without additional specificity, the term is indefinite and renders asserted claims 26, 27, and 30 of the '973 patent invalid.

Those of skill in the art use a variety of measures to evaluate the "clinical response" of a patient with Crohn's disease to a therapeutic regimen. (*See* Ex. 11 (evaluating "12 definitions of clinical response").) One common measure used in clinical studies is the Crohn's Disease Activity

Index ("CDAI"), which assigns values to certain symptoms and parameters of Crohn's disease, creates a score by summing those values, and uses the score to evaluate disease severity. (Ex. 12.) Nevertheless, some Crohn's clinical studies use different measures to assess clinical response, including Inflammatory Bowel Disease Questionnaire ("IBDQ") score, C-reactive protein ("CRP") levels, and reduction in fistulas. (*See* JA000163, 74:14-23; Ex. 13.) And in clinical practice, outside of clinical studies, physicians generally do not use the CDAI or other similar measures, but instead "rely on their global clinical judgement, which is less reproducible, but simpler for decision-making." (Ex. 12.)

Even if we were to focus on the CDAI measure only, different studies use different thresholds for evaluating clinical response, as exemplified below:

- Hanauer 2006: "A response was ***defined as*** a reduction of ≥70 points (70-point response) or of ≥ 100 points (100-point response) from week 0 in the CDAI score." (Ex. 14.)

- Hanauer 2002: "2 weeks later, patients were assessed for a response to treatment ***as defined by*** a decrease in CDAI score of 70 points or more from the baseline value and at least a 25% reduction in the total score." (Ex. 15.)

- 2004 Abbott Press Release: "Clinical response (a decrease in CDAI compared to baseline of ≥ 70 or ≥ 100 points) and clinical remission within each dose group also were assessed." (Ex. 16.)

- Schreiber 2005: "The primary end point was the percentage of patients with a clinical response at week 12 (a Crohn's Disease Activity Index decrease of > 100 points or remission [Crohn's Disease Activity Index < 150 points] in the intent-to-treat population." (Ex. 17.)

- Remicade 2002 Label: One of the trials discussed on the label refers to "clinical response" as a "decrease in CDAI ≥ 70 points." (Ex. 13.)

Because of the varying thresholds for clinical response, each study defines the particular measure it is using. (*Id.*; *see also* Ex. 11.) Without clarity on the measure of clinical response, a skilled artisan would not be able to say with reasonable certainty if one was achieved.

The intrinsic evidence provides no such clarity. The claims simply recite "achieving a

28

clinical response," without providing any guidance as to how that clinical response is to be evaluated. And the specification exacerbates the problem. First, it uses two separate CDAI measures of clinical response for Crohn's disease. Example 1 states that "[c]linical response, defined as a decrease in CDAI compared to the CDAI baseline reading of ≥70 [Δ70] *or* ≥100 points [Δ100], was also assessed in the participants." (JA000163, 74:10-13; *see also* JA000119-20, Figs. 3A-4A; JA000130, 7:11-12, 7:19-21.) Thus, in Example 1, a CDAI decrease from baseline of 70 *or* 100 would qualify as a clinical response. Unlike Example 1, however, Example 2 defines clinical response only as "decrease in CDAI of >/=100 points." (JA000164, 75:43-44.) Under Example 2's definition, a CDAI decrease of 70, which was a "clinical response" under the standards used in Example 1, would not qualify. In addition to these conflicting examples, the specification also refers to several of the other clinical outcome measures, such as IBDQ score and CRP levels. (JA000163, 74:14-23 (describing additional efficacy measures).) Thus, the specification shows that skilled artisans would not know how to apply "achieving clinical response" without a specifically defined measure and threshold. And the prosecution history provides no additional insight into the term's meaning.

This situation is similar to that in *Dow*, where the Federal Circuit concluded that the term "slope of strain hardening coefficient" was indefinite because there were multiple methods for measuring the slope that could produce different results, and the intrinsic evidence did not "provide[] any guidance as to which method should be used." *Dow*, 803 F.3d at 634; *see also Teva*, 789 F.3d at 1341 (finding indefiniteness where there were multiple ways to evaluate "molecular weight" and intrinsic evidence did not provide guidance as to which to use). So too here. There are multiple measures for achieving clinical response, and the same clinical result could meet some measures but not others, as shown in the specification and the relevant art. Where "multiple known

29

approaches exist" for evaluating a claimed parameter, a term claim is indefinite unless a skilled artisan "would know which approach to select." *Dow*, 803 F.3d at 630.

Here, as in *Dow*, there is simply no teaching as to which approach to select; instead, there are teachings to use multiple different approaches that "do not always produce the same results" as to whether a clinical response is achieved, leaving a skilled artisan uncertain as to what would and would not infringe. *See Dow*, 803 F.3d at 634; *cf. Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1254-56 (Fed. Cir. 2008) (finding term "fragile gel" indefinite under construction that "require[d] that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and . . . such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not)").

AbbVie's proposed construction provides no clarity as to the term's meaning. AbbVie proposes that "achieving a clinical response" means "a meaningful therapeutic effect, as measured by CDAI score or similar, e.g., a decrease in CDAI of 70 points or more." This definition would presumably encompass any definition of clinical response that one could come up with as it (1) uses the undefined language "a meaningful therapeutic effect," (2) indicates that response can be determined by CDAI score "or similar," and (3) even for CDAI, fails to specify what score would indicate a response ("*e.g.,* a decrease in CDAI of 70 points or more"). AbbVie's construction thus provides no reasonable certainty as to the scope of the term—it could presumably be met (or not) based on any of the various measures of clinical response discussed above—and is still indefinite.

## CONCLUSION

For all the foregoing reasons, Alvotech respectfully requests that the Court find that the disputed claim terms of the '792 and '973 patents are indefinite and adopt Alvotech's proposed constructions of the disputed claim terms of the '619, '030, and '686 patents.

Date: November 19, 2021             Respectfully submitted,

ALVOTECH HF.

By: */s/ Louis E. Fogel*
Louis E. Fogel (# 6281404)
**JENNER & BLOCK LLP**
353 N. Clark St.
Chicago, IL 60654
Tel: 312-222-9350 / Fax: 312-527-7764
Email: lfogel@jenner.com

Jonathan Singer
**FISH & RICHARDSON P.C.**
12860 El Camino Real, Ste. 400
San Diego, CA 92130
Tel: 858-678-5070 / Fax: 858-678-5099
Email: singer@fr.com

Martina Tyreus-Hufnal
Douglas McCann
**FISH & RICHARDSON P.C.**
222 Delaware Ave, 17th Fl.
Wilmington, DE 19801
Tel: 302-652-5070 / Fax: 302-652-0607
Email: tyreushufnal@fr.com;
dmccann@fr.com

*Attorneys for ALVOTECH HF.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2021 I caused a true and correct copy of the foregoing

to be electronically served on counsel of record via the Court's CM/ECF system.


/s/ *Louis E. Fogel*
Louis E. Fogel